104 N.J. Super. 335 (1969)
250 A.2d 40
FRANK MARTIN, PLAINTIFF-RESPONDENT,
v.
PERTH AMBOY GENERAL HOSPITAL, A CORPORATION OF THE STATE OF NEW JERSEY, E. VIRGINIA DZURINA AND SOKOL KANGSOBHIA, DEFENDANTS-APPELLANTS AND CROSS-RESPONDENTS, AND RALPH LEV, M.D., DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued January 13, 1969.
Decided February 5, 1969.
*337 Before Judges GOLDMANN, KOLOVSKY and CARTON.
Mr. Raymond M. Tierney, Jr. argued the cause for appellant Ralph Lev (Messrs. Shanley & Fisher, attorneys; Mr. John F. Lynch, Jr. and Mr. A. Dennis Terrell, on the brief).
Mr. Oscar F. Laurie argued the cause for appellants and cross-respondents Perth Amboy General Hospital, E. Virginia Dzurina and Sokol Kangsobhia (Messrs. Lieb and Teich, attorneys; Mr. Aaron Dines, of counsel).
Mr. Alfred A. Levinson argued the cause for respondent (Messrs. Jacob, Alfred and Richard Levinson, attorneys).
The opinion of the court was delivered by KOLOVSKY, J.A.D.
On December 15, 1964, at the Perth Amboy General Hospital (hospital), Dr. Lev, a cardiovascular surgeon, operated on plaintiff Frank Martin to remove an obstruction in his abdominal aorta. Following plaintiff's discharge from the hospital on December 28, 1964 he visited Dr. Lev on two occasions and was told that the increasing pain in his abdomen about which he complained was to be expected and would pass away. On February 12, 1965, an X-ray taken by the internist who had referred plaintiff to Dr. Lev disclosed that there was a foreign substance in plaintiff's abdomen. The internist so advised Dr. Lev who had plaintiff readmitted to the hospital. On February 13 Lev *338 opened plaintiff's abdomen and removed therefrom a laparotomy pad  a surgical sponge  which had been left therein during the course of the first operation.
In this action for damages resulting from the laparotomy pad being left in his abdomen, plaintiff charged Dr. Lev, the hospital and three of its nurses with negligence. The jury returned a verdict of $36,000 against Dr. Lev, the hospital and two of its nurses, defendants Dzurina and Kangsobhia. It found no cause for action as against a third nurse, Mrs. Quan. Separate motions for new trial by Dr. Lev and by the other defendants were denied.
Thereafter, on application of the hospital and the two nurses for apportionment of the $36,000 judgment among defendants, the court ordered Dr. Lev to pay 50%, or $18,000, and the hospital and the two nurses as a group to pay the remaining 50%, with the hospital to pay no more than $10,000, the statutory limit of its liability. N.J.S. 2A:53A-8.
Dr. Lev appeals from both the judgment in plaintiff's favor and the order of apportionment. The hospital and the two nurses appeal from the judgment and the denial of their motion for a new trial, contending that the $36,000 verdict is excessive. The remainder of their brief embodies their argument in support of the judgment against Dr. Lev and the order for apportionment.
Much of the pertinent evidence is uncontradicted.
Plaintiff entered the hospital on December 4, 1964 for evaluation of his peripheral vascular disease by Dr. Lev, a cardiovascular specialist and the only such specialist associated with the hospital. An angiogram taken at Lev's direction disclosed that there was an obstruction in the abdominal aorta, the blood vessel which supplies blood to the arteries of the leg. Lev recommended an operation to remove the obstruction and restore the normal blood flow.
Dr. Lev performed the operation from about 2 to 7 P.M. on December 15, assisted by two other doctors as well as by a "scrub" (sterile) nurse and a circulating nurse. When the *339 operation began the scrub nurse was Miss Adamowitz; defendant Kangsobhia was the circulating nurse. At about 3:30 P.M., when the nurses' shift ended, as Dr. Lev knew it would, defendant Quan was substituted as the scrub nurse and defendant Dzurina as the circulating nurse and they continued on duty until the patient was removed from the operating room.
The surgical sponges used during the operation were supplied by the hospital. They were brought into the operating room in a sterilized laparotomy pack containing four laparotomy pads, 20 Raytex sponges and 15 tampons. The Raytex sponges, 4" x 8" in size, and the tampons were used for wiping or dabbing during the operation.
The laparotomy pads, described in the testimony as 8-inch square with a 4 or 5-inch attached string at the end of which was a metal ring 1 to 2 inches in diameter, were used primarily for the purpose of pushing aside intestines and other organs in the operative field and to separate one area within the operative field from another. Embedded between the folds of the laparotomy pad was a strip of radiopaque material which would show on an X-ray if the pad were left in the abdomen. (Although not material to the issues before us, we note that the testimonial description of the laparotomy pads differs from the measurements of the sample laparotomy pad marked into evidence as Exhibit DH-1 which has been furnished to us. That exhibit is a gauze pad measuring approximately 13 1/2" x 13 1/2" with an attached 6 1/2-inch string at the end of which is a heavy metal ring 1 3/4 inches in diameter.)
It is conceded that when the laparotomy pads were brought into the operating room, the metal rings were attached thereto and that at some time before they were used the rings were removed, this at the direction of Dr. Lev.
Before the operation began, the laparotomy pads and other sponges were placed in separate receptacles and counted by the two nurses with the count being recorded on a sponge count sheet. A second count was made at the change of *340 shift when the new scrub nurse and circulating nurse came on duty. A third count was made at the completion of the operation. For some unexplained reason, the count as reported indicated that no sponge or pad was missing.
Dr. Lev testified that before ordering the final sponge count when the operation was completed and before he closed the wound, he made a visual and manual inspection of the abdomen to determine if a foreign substance had been left there. He made no further examination and did no further probing of the operative area for sponges after the count had been reported to him as correct.
The court's charge permitted the jury to find Dr. Lev liable on either or both of two bases: (1) that he himself was negligent or (2) that the nurses were negligent in counting the sponges, the jury being told that the nurses "were, during the course of the surgery, as if they were [the doctor's] servants assisting in the performance of the operation even though they were actually employed by the defendant hospital [and were] at the same time * * * also acting as the servants of the defendant hospital".
Lev argues the court erred in both aspects of the submission to the jury, contending that there was no evidence of his own negligence and no warrant in law for holding him liable for the negligence of the nurses.
We find no merit in the claims that there was no evidence to support a jury finding that Lev himself was negligent and that the court erred in permitting the doctrine of res ipsa loquitur to be applied against him.
Foreign object malpractice cases form a unique class, presenting considerations different from those involved in other kinds of medical malpractice actions. Cf. Fernandi v. Strully, 35 N.J. 434, 441 (1961). As noted in Louisell and Williams, Trial of Medical Malpractice Cases, ¶ 4.04, p. 116:
"The most distinct and homogeneous group of malpractice cases are those resulting from inadvertent inclusions of foreign substances, gauze sponges, surgical needles, instruments, tubes, and the like, in patients' bodies at the close of surgery. For neither physician nor layman *341 is it difficult to accept the fact that foreign bodies should not be left in the patient, and seldom today is there an honest controversy as to whether leaving them constitutes negligence. Defense of these claims is instead apt to be based on the statute of limitations or denial that defendant was the responsible person or that the inclusion actually caused damage."
It cannot be gainsaid that among the duties owed by an operating surgeon to his patient is the "duty of removing all foreign substances from the surgical wound before closing it," and that "a surgeon undertaking to perform an operation requiring the placing of sponges in the incision does not complete his undertaking until the sponges are properly removed." 41 Am. Jur., Physicians and Surgeons, §§ 96, 97, p. 213.
Some jurisdictions  for example the State of Washington  hold "that a surgeon [is] negligent as a matter of law in introducing a sponge and inadvertently leaving it in the plaintiff's body on closing the incision." Conrad v. Lakewood General Hospital, 67 Wash.2d 934, 410 P.2d 785, 10 A.L.R.3d 1, 5 (Sup. Ct. 1966); McCormick v. Jones, 152 Wash. 508, 278 P. 181, 65 A.L.R. 1019 (Sup. Ct. 1929); see also, 41 Am. Jur., Physicians and Surgeons, § 97, p. 213; Louisell and Williams, Trial of Medical Malpractice Cases, ¶ 14.06, pp. 441-442. It should be noted that no question of emergency or other extenuating circumstance was involved in any of the cases cited. Cf. Harrison v. Wilkerson, 56 Tenn App. 188, 405 S.W.2d 649, 651 (Tenn. Ct. App. 1966).
Other jurisdictions have held that it is for the surgeon to acquit himself of negligence when it is shown that a foreign substance has been left in the wound. See, e.g. Davis v. Kerr, 239 Pa. 351, 86 A. 1007, 46 L.R.A., N.S., 611 (Sup. Ct. 1913).
But our highest court has spoken otherwise. Niebel v. Winslow, 88 N.J.L. 191 (E. & A. 1915); Stawicki v. Kelley, 113 N.J.L. 551 (Sup. Ct. 1934), aff'd 115 N.J.L. 190 (E. & A. 1935). It is therefore not for us, as an intermediate *342 appellate court, to evaluate the logic or desirability of the rules adopted by the cited jurisdictions, or to hold that the duty owed by a surgeon to a patient to remove all foreign objects should properly be held to be a nondelegable duty. See as to nondelegable duties generally, Prosser on Torts (3d ed.), § 70, p. 483; 2 Harper & James, The Law of Torts, § 26.11, p 1406; Mayer v. Fairlawn Jewish Center, 38 N.J. 549, 555 (1962), and cases cited therein.
Under our cases, proof that a foreign substance has been left in the wound after the incision has been closed is prima facie proof that the operating surgeon has been negligent  the res ipsa loquitor doctrine applies, Sanzari v. Rosenfeld, 34 N.J. 128, 140 (1961)  but the ultimate burden of persuasion that the surgeon has been negligent remains with plaintiff. Niebel v. Winslow, supra.
In Niebel v. Winslow the trial court had told the jury in the course of its charge that:
"If you find that the gauze was left in the abdomen of the plaintiff, and the incision sewed up, or allowed to heal up over it, the burden of proof is on the defendant to show that it was not left there by any carelessness or negligence of his."
In holding that the charge was error, the Court of Errors and Appeals said:
"Neither the single fact nor the group of facts stated in this [request to charge] shifted to the defendant the burden of proof which, notwithstanding such facts, remained with the plaintiff. The facts recited in the request were a part of the plaintiff's case, in that they were steps in the establishment of the negligence of the defendant, the burden of proving which was upon the plaintiff; the effect, therefore, of the request was that the jury was told that if the plaintiff had established these steps in its proof of the defendant's negligence, the burden of exculpating himself from the complete charge of negligence was shifted to the defendant.
This was the precise error for which this court recently reversed the judgment in the case of Hughes v. Atlantic City [& S.] Railroad Co., 85 N.J.L. 212, * * *.

* * * * * * * *
The practically injurious nature of the [charge] will at once be apparent when it is remembered that in the present case the operation, *343 although performed by the defendant, a private practitioner, was performed by him in a hospital where he was assisted by trained resident nurses, presumably in the employ of the hospital and familiar with their duties.
While the testimony is meager as to the precise nature of these duties, it is inferable from the evidence and from the terms `operator' and `assistants' that it was the duty of the latter, at or just before the close of the operation, to count the sponges in use, which at that critical stage the operator himself could not do without jeopardy to his patient." (88 N.J.L., at pp. 192, 193, 194).
In Stawicki v. Kelley, supra, the court rejected, as have the majority of other jurisdictions, the defendant-surgeon's contention that since the hospital nurses who kept count of the sponges and reported the count correct
"were not in defendant's employ or furnished by him * * * he was entitled to rely on their report of the count without being required to make any extended examination of the internal conditions, or being responsible for an erroneous count."
The court also noted that defendant argued further
"that any possible duty of independent examination resting on him was shown to have been adequately performed; and hence that there was nothing in the evidence to justify a jury in finding negligence, and that the court should not have submitted the case to them,"
and concluded
"we consider in this case that notwithstanding the nurses' count, some duty remained with the defendant to examine independently to make sure that no foreign body remained in the abdominal cavity, and that the existence and non-discovery of so considerable a body as the pad above described, particularly in view of the testimony of plaintiffs' expert witness as to the usual practice of making some independent examination by the surgeon and the extent thereof, presented a case for submission to the jury. The fact that defendant was operating with nurses not in his employ, nor, so far as appears, of his own selection, seems to give emphasis to this view. We conclude therefore that the judgment should be affirmed." (113 N.J.L., at pp. 552, 553)
*344 Here there was plenary evidence to support a jury finding that Lev himself was negligent. The application of the res ipsa loquitur doctrine permitted the jury to so infer under the circumstances of this case. Cf. Sanzari v. Rosenfeld, supra, 34 N.J., at p. 141; Bornstein v. Metropolitan Bottling Co., 26 N.J. 263 (1958). In addition, there was evidence of specific negligent acts and omissions by Lev.
The jury could justifiably conclude, on the basis of the opinion testimony given by plaintiff's expert, Dr. Graubard, and from Lev's own description of what he did, that Lev was negligent in failing to discover by examination and observation the presence of this large laparotomy pad.
The jury was not compelled to give credence to the testimony of Lev and his expert that the sole reason for a heavy 1 3/4-inch metal ring connected to the pad by a six-inch string is to furnish a radiopaque material that would make the pad visible if it were left in the abdomen and an X-ray then taken. All concede that the piece of radiopaque material in the pad itself already serves that function. The jury could find significant the inability of Lev's expert to offer any reason why the ring is made as large as it is if its only function is what he said it was.
The jury could properly find more persuasive the testimony of Dr. Graubard, Mrs. Boniewski, the hospital's experienced operating room supervisor, and the other nurses that the pad is furnished with the attached ring so that the ring may be left hanging outside the abdomen, after the laparotomy pad is inserted therein, to act as a marker or an indicator that the pad is in the abdomen. Unlike wiping sponges which are disposed of as soon as used and are not left in the abdomen, laparotomy pads are inserted in the abdomen and remain there for substantial periods of time.
Further, the jury did not have to accept the word of Lev and his expert that use of the laparotomy pads without the rings attached conformed to the applicable standard of care. The jury could properly conclude, not only from the testimony of Dr. Graubard but also from the testimony of Mrs. *345 Boniewski, that it was negligent to order, as Lev did, that the rings be removed from all the laparotomy pads; or, that if for some reason it was necessary to remove a ring from one or more of the pads, it was negligent to insert such a pad in the abdomen without first taking other special precautions to insure that it would be removed before the incision was closed. While Dr. Graubard conceded that on occasion a surgeon might find it necessary to remove the ring from a laparotomy pad  an occasion which he said was not necessary where, as here, the pad was inserted in the upper abdomen  he said that if a ring were removed special warning should be given to the assistants and nurses to insure that special care was taken that the pad was later removed from the abdomen.
Finally, we note that a recent annotation, "Malpractice  Foreign Objects," 10 A.L.R.3d 9 (1966), points out that:
"Three of the most common methods of preventing operating room objects from being left in a surgical wound are (1) sponge or instrument counts, (2) attachments on laparotomy pads and on drains and tubings, and (3) X-rays taken at the time of the operation, sometimes made more effective by the use of radiopaque threads in sponges and pads. X-rays are also one of the post-operative methods of detecting foreign objects left in an operative wound." (at p. 16).

* * * * * * * *
"A laparotomy pad usually has a loop of tape at one corner for the attachment of a metal ring about 1 1/2 inches in diameter. The metal ring attached to the loop remains outside the edges of the wound during the operation, enabling the surgeon to tell at a glance the number of pads in the wound and to locate each one easily by picking up the ring.

* * * * * * * *
In several cases [see e.g. Funk v. Bonham, 204 Ind. 170, 183 N.E. 312, 317 (Sup. Ct. 1932); Ault v. Hall, 119 Ohio St. 422, 164 N.E. 518, 519, 60 A.L.R. 128 (Sup Ct. 1928); McLennan v. Holder, 1 Cal. App.2d 305, 36 P.2d 448 (Ct. of App. 1934)] it has been held that the use of laparotomy pads without metal rings or other objects attached thereto is evidence of negligence in a suit for injuries sustained as a result of such a pad having been left in an operative wound." (at p. 31).
The issue presented with respect to the court's charge as to the liability of the doctor for the acts or omissions of the *346 nurses involves the "borrowed servant" doctrine. See generally, Devone v. Newark Tidewater Terminal, Inc., 14 N.J. Super. 401 (App. Div. 1951); Younkers v. Ocean County, 130 N.J.L. 607, 608 (E. & A. 1943); Larocca v. American Chain and Cable Co., 13 N.J. 1, 6 (1953); 2 Harper & James, The Law of Torts (1956), § 26.11, p. 1398, fn. 14.
The doctrine recognizes, in the words of Restatement, Agency (2d), § 227 that:
"A servant directed or permitted by his master to perform services for another may become the servant of such other in performing the services. He may become the other's servant as to some acts and not as to others,"
comment (a) to that section adding,
"Since the question of liability is always raised because of some specific act done, the important question is not whether or not he remains the servant of the general employer as to matters generally, but whether or not, as to the act in question, he is acting in the business of and under the direction of one or the other."
Louisell and Williams, Trial of Medical Malpractice Cases, § 16.05, pooints out that:
"The borrowed servant doctrine appears often in malpractice cases chiefly because of the relationship between hospital employees and staff physicians. Seldom in other areas of potential application of respondeat superior is the issue of `control' as crucial or as difficult to resolve as it is in many of the physician-hospital relationships. Although hospital employees primarily are servants of the hospital and not of the physician, the familiar rule of agency law that a servant may serve two masters simultaneously, and at times only momentarily, comes into play when internes, nurses, or other hospital personnel assist a physician as he treats a patient.
* * * A holding that the requisite control existed often has been predicated on the physician's presence at the time the negligent act occurred and the fact that he had a genuine opportunity to alter the course of events.

* * * * * * * *
Whether a surgeon is vicariously responsible under the borrowed servant doctrine for a particular act of a nurse, may be a difficult question. Sometimes it is one of fact for the jury."
*347 See, also, Annotation, "Liability of operating surgeon for negligence of nurse assisting him," 12 A.L.R.3d 1017 (1967).
In the case before us, the trial court, after explaining the doctrine of respondeat superior to the jury said:
"Additionally, in this case we have the defendant doctor, who was the principal in charge of the surgery, and consequently he had the authority and the responsibility to direct and supervise the actions and behavior of the nurses assisting in the performance of the operation while he was in the operating room. They were, during the course of the surgery, as if they were servants, assisting in the performance of the operation even though they were actually employed by the defendant hospital. At the time the nurses were also acting as the servants of the defendant hospital."
Lev contends that the charge adopts the "captain of the ship" doctrine, see McConnell v. Williams, 361 Pa. 355, 65 A.2d 243, 246 (Sup. Ct. 1949); McKinney v. Tromly, 386 S.W.2d 564, 12 A.L.R.3d 1011 (Tex. Civ App. 1965); Annotation, 12 A.L.R.3d, at p. 1021, and that the doctrine is not the law of this State. However, the correctness of a charge must be determined not in the abstract but against the backdrop of the evidence in the case.
Had Dr. Lev not ordered the nurses to remove the rings from the laparotomy pads furnished by the hospital, we would agree with him that the charge given by the trial court is contrary to what is implicit in the New Jersey courts' opinions in Niebel v. Winslow and Stawicki v. Kelley, discussed supra. What the courts said in those cases would be meaningless and would not support the results reached if the rule were that the nurses who made the sponge counts were to be deemed the doctor's servants. Both cases recognize that normally a nurse making a sponge count in an operating room acts only as the agent of her general employer, the hospital, even though she is subject to the directions of the surgeon, and that only the hospital and not the doctor is liable for the nurse's negligence in making the count. That conclusion is consistent with the general rule that a borrowed *348 servant does not become the servant of the temporary employer merely because he received instructions from the latter as to the work to be performed. Viggiano v. William C. Reppenhagen, Inc., 55 N.J. Super. 114, 119 (App. Div. 1959).
But Lev's conduct with relation to the nurses and the laparotomy pads went far beyond the situation contemplated by the general rule. One of the essential reasons of the hospital for having the rings attached to the laparotomy pads which it furnished was to avoid errors in the counts to be made by its nurses. Lev ordered the nurses to remove the rings and they did so. By exercising control of the nurses to the extent of directing them to remove the rings and thus eliminating the safeguards provided by the hospital to insure a proper count by its employees (particularly since he knew that there would be a change in the shift of nurses during the operation), Lev became, in our view, the nurses' "temporary or special employer" insofar as their duties involved the laparotomy pads used in the operation. As such, he was equally liable with their general employer for their subsequent negligence in counting the pads. See Restatement, Agency 2d, § 227, comment (d); see also Devone v. Newark Tidewater Terminal, Inc., supra, concurring opinion 14 N.J. Super., at p. 415. There was therefore no error in the court's charge.
All the defendants attack the verdict of $36,000 as excessive. We have reviewed the evidence as to the injury, pain and suffering sustained by plaintiff because the laparotomy pad was left in his abdomen. Evaluation of the credibility and weight to be given plaintiff's testimony and that of his physician was for the jury. In view of the limited scope of our review on an appeal from an order denying a new trial, Kulbacki v. Sobchinsky, 38 N.J. 435, 446 (1962), we find no basis for reversing the trial court's determination that the jury's admeasurement of damages should not be disturbed. Cf. Wytupeck v. City of Camden, 25 N.J. 450, 466 (1957).
*349 Lev's final contention is that the trial court's order of apportionment was in error in requiring him to pay 50% of the judgment or $18,000. We find no error prejudicial to Lev in the equitable determination made by the trial judge in its application of the provisions of the Joint Tortfeasors Contribution Law, N.J.S. 2A:53A-1 et seq., and this whether the jury's verdict was based on a finding that Lev himself was negligent in addition to finding him liable because the nurses were negligent.
Lev does not contend that it would be inequitable to require him to pay one-half of the judgment if he himself were negligent. We are satisfied that it is also not inequitable to require him, as one of the two employers of the nurses, to pay the same proportion thereof if his liability was based solely on the negligence of the nurses. It is immaterial that by reason of the charitable immunity statute, N.J.S. 2A:53A-8, the liability of the other employer, the hospital, is limited to $10,000, so that the nurses are obligated to pay the balance thereof.
Whether Lev, if he were free from fault, might be entitled to indemnification from the nurses is likewise irrelevant to the question of contribution involved in the order of apportionment. His belated attempt during the trial to add "indemnification" as one of the issues to be tried was properly denied.
The judgment for plaintiff and the order of apportionment are affirmed.