**CITY OF SOMERSET and Somerset City Hospital, Appellants,**

v.

**Richard Louie HART, Appellee.**

Supreme Court of Kentucky.

April 1, 1977.

Robert L. Milby, Hamm, Taylor, Milby & Farmer, London, for appellants.

Brown, Sledd & McCann, Lexington, Sutton, Higgason & Davis, Corbin, for appellee.

LUKOWSKY, Justice.

This is an appeal by the Hospital and its alter ego, the City, from their share of a $28,144.38 malpractice judgment in favor of Hart. The verdict of the jury apportioned the recovery forty percent or $11,257.75 against the operating surgeon and sixty percent or $16,886.63 against the Hospital and the City. The surgeon has paid his share and gone forth rejoicing.

In July of 1970 Hart was afflicted with a kidney stone. His family physician referred him to a surgeon for further treatment. Surgery was indicated and Hart was admitted to the Hospital. The stone was located in the ureter near its entrance into the bladder. The surgeon first sought to remove the stone by use of a cystascope and a "basket." This procedure was unsuccessful. Major surgery was indicated.

Hart was taken to the operating room and given a general anesthetic. The surgeon opened his abdomen and exposed the ureter and bladder. In order to remove the stone it was necessary for the surgeon to incise both the ureter and bladder. After the stone was removed, the surgeon closed. This was the first time Hart had undergone abdominal surgery.

Hart's hospital recuperation was uneventful. He was seen by his surgeon postoperatively at four and six weeks and discharged. On each occasion he complained of pain and was told that this was not abnormal. For about three months the pain remitted and then it exacerbated. Hart again sought the aid of a family physician.

This physician treated Hart with analgesics and prostate massage. His symptomatology of pain and bloody urination continued to worsen. In August of 1971 he was referred to another surgeon who examined him and took x-rays. The x-rays revealed a bladder stone from which a scalpel blade protruded.

Shortly thereafter Hart's urinary system became completely obstructed with blood clots. The second surgeon admitted Hart to a second hospital. A second major operation was performed and the clots, stone and blade were removed. It was established that the pain, bleeding and clots were caused by the stone and blade irritating the wall of the bladder. Since the second oper-

ation his condition has progressively improved.

Obviously, the part of the Hospital in the first operation becomes the subject of scrutiny.

The Hospital supplied the operating room and staffed it with a supervisor, a scrub nurse and a circulating nurse. This staff was selected, paid and generally supervised by the Hospital. The staff was required to set up the room, lay out the instruments, including scalpels with blades attached, hand instruments to the surgeon and generally assist him during the operation. The operating surgeon was authorized to supervise and direct the staff in the operating room.

The Hospital supplied the instruments in the form of an instrument pack. This pack is a set of instruments of a type and number prescribed by the Hospital sufficient to perform the operation scheduled by the surgeon. The packs are assembled by employees of the Hospital. The rules of the Hospital do not require that the number of instruments be verified by their operating room staff by either a preoperation or preclosing instrument count. However, the Hospital does require its operating room staff to make a post operation count at the time the instruments are cleaned, to keep count of the number of scalpel blades used and to report any deficiency. No such report was made here either to the hospital administration or the operating surgeon. If a scalpel blade becomes dull during an operation it is the duty of the operating room staff on request of the surgeon to obtain a new blade, replace the dull one on the handle and dispose of the used blade. No one recalls whether such a replacement was made here.

The only assignment of error by the Hospital worthy of discussion is that the operating room staff are the borrowed servants of the surgeon and that the Hospital as their general employer is not liable for their negligence. Hart's response to this assignment of error is that there is distinction between administrative and medical acts, that the Hospital is the master in regard to

administrative acts, that the surgeon is the master in regard to medical acts, and that the failure to account for a scalpel blade is an administrative omission chargeable to the Hospital. The parties rely on a plethora of cases, most of which are discussed in an annotation, "Liability of Hospital for Negligence of Nurse Assisting Operating Surgeon", 29 A.L.R.3d 1065 (1970). We find both submissions to be superficial.

■ The borrowed servant doctrine frequently rears its head in malpractice cases primarily because of the relationship between hospital employees and attending staff physicians and surgeons. In few other areas where the doctrine of respondeat superior may be potentially applicable is the issue of control as crucial or as difficult to resolve as it is in many of the doctor-hospital relationships. Although hospital employees are primarily servants of the hospital and not of the doctor the familiar rule of agency law that a servant may serve two masters simultaneously, and at times only momentarily, comes into play when interns, nurses or other hospital personnel assist a physician or surgeon as he treats a patient. Restatement of Agency 2d, Secs. 226, 227 (1957); *Stewart v. Manasses*, 244 Pa. 221, 90 A. 574 (1918); *Dickerson v. American Sugar Refining Co., Inc.*, C.A.3d, 211 F.2d 200 (1954).

■ A dangerous tendency exhibited in some of the borrowed servant malpractice cases is to blindly hold that because a nurse or other hospital employee was lent to a physician or surgeon so as to render him liable under the doctrine of respondeat superior for the employee's negligence, the hospital by reason of the loan necessarily ceased to be liable. *Minogue v. Rutland Hospital*, 119 Vt. 336, 125 A.2d 796 (1956). Sometimes, even though the question may be left to the jury as to which was liable, doctor or hospital, the assumption is clearly that only one of them could have been liable because the hospital employee could not simultaneously have been the servant of both. *McCowen v. Sisters of Most Precious Blood of Enid*, 208 Okl. 130, 253 P.2d 830 (1953); *Cavero v. Franklin Benevolent Soci-*

*ety*, 36 Cal.2d 301, 223 P.2d 471 (1950). This is to ignore the legal principle that a person may be the servant of two masters, not joint employers, at one time as to one act, if the service to one does not involve the abandonment of the service to the other. Restatement of Agency, 2d, Sec. 226 (1957).

Frequently, if not most often, the hospital nurse or other employee who is temporarily lent to the physician or surgeon, in every realistic sense continues to carry on her hospital duties. Her work is of mutual interest to both of two employers, the physician or surgeon and the hospital, and is performed to effect their common purpose. The doctrine of respondeat superior is therefore equally applicable to both employers. *Dickerson v. American Sugar Refining Co.*, supra. *Martin v. Perth Amboy General Hospital*, 104 N.J.Super. 335, 250 A.2d 40 (1969). *Tonsic v. Wagner*, 458 Pa. 246, 329 A.2d 497 (1974).

The failure of courts to more generally perceive this is probably due to an unarticulated feeling that it would be unjust to impose liability on the hospital where the nurse has only obeyed the orders of her superior, the physician or surgeon. We recognize that the nurse's duty to obey such orders exculpates her and her hospital employer from responsibility for the results of the competent execution of the orders, unless the orders are so obviously improper that the ordinarily prudent nurse would not obey them. When exculpation is the result, it is so because the nurse's obedience to the orders does not constitute negligence, and consequently, there is no basis for vicarious liability of the hospital. This is far different from a general and uncritical elimination of the hospital's liability under the doctrine of respondeat superior solely because the nurse or other employee was lent to the physician or surgeon.

It is beyond cavil in this case that the accurate accounting for scalpel blades is "of mutual interest to both" the surgeon and the hospital, that such an accounting "effects their common purpose", i. e., the cure of the patient, and that the surgeon issued no orders to the operating room staff in regard to the accounting for scalpel blades which conflicted with those of the Hospital. Consequently, the operating room staff acted as servants of both the surgeon and the hospital as a matter of law.

The facts of this case which we have so tediously related mandate the application of the doctrine of "res ipsa loquitur". *Jewish Hospital Association of Louisville v. Lewis*, Ky., 442 S.W.2d 299 (1969). Once the doctrine is applied the jury had a right to infer, as it did, that the operating room staff failed in its duty to accurately account for scalpel blades and that such failure was a substantial factor in causing the scalpel blade to be left in Hart's bladder with attendant and protracted bad results. This negligence is of course, as chargeable to the hospital as it is to the surgeon.

The judgment is affirmed.

All concur.