**Rebecca A. REFFITT, Individually and Rebecca A. Reffitt, as Administratrix of the Estate of Chad W. Reffitt, Deceased,** Appellants/Cross–Appellees,

v.

**Naji HAJJAR, M.D., Individually and Naji Hajjar, M.D., P.S.C., Appellee/Cross–Appellant.**

**Nos. 92–CA–2710–MR, 92–CA–2953–MR.**

Court of Appeals of Kentucky.

May 27, 1994.

Withdrawn and Reissued Sept. 2, 1994.

Discretionary Review Denied by Supreme Court March 14, 1995.

Garis L. Pruitt, Catlettsburg, for appellants/cross-appellees.

Kenneth Williams, Jr., Ashland, for appellees/cross-appellants.

## ORDER GRANTING PETITION FOR REHEARING

The appellee/cross appellant's Petition for Rehearing is granted. The original opinion is withdrawn and a new opinion is substituted therefor.

ALL CONCUR.

ENTERED: September 2, 1994

        (s) Joseph R. Huddleston
        Judge, Court of Appeals

Before HUDDLESTON, JOHNSON and McDONALD, JJ.

## OPINION

McDONALD, Judge.

The appellant, Rebecca Reffitt, was taken to King's Daughters' Medical Center at about 5 o'clock on the morning of August 1, 1990, by her husband, Mark Reffitt, to deliver their first children, identical twin boys. Rebecca, a medicaid recipient, had received prenatal care at the Boyd County Clinic. Dr. Hajjar, her doctor, had a booming obstetric practice and delivered one-third of all the babies at King's Daughters' in Ashland. There is no question that Rebecca Reffitt received appropriate prenatal care and that the babies were, prior to her labor, in excellent health in utero.

Between the time Rebecca was admitted to King's Daughters' and 2:58 p.m. in the afternoon when the first baby, Chad Reffitt, was delivered, something went terribly wrong. The babies were tracked throughout the day by a fetal heart monitor. The monitor showed the beating patterns of both babies' hearts and the contractions Rebecca was experiencing. Although both babies demonstrated normal heart rates initially, by 9:30 a.m., as Rebecca's labor increased, Chad's heart rate indicated he was suffering fetal distress. Rebecca's experts at trial, Dr. Gordon and Dr. Narayan, testified that intervention by caesarian section was indicated no later than 10:30 a.m.

At around 11:00 a.m. Rebecca's labor slowed down, and when Dr. Hajjar visited her room at 11:30, the monitor indicated that Chad's heart rate was high, but other signs of fetal distress were not present. Dr. Hajjar testified that at that time he reviewed the entire monitor strips for the period of 9:30 to 11:30 and found nothing to be concerned about. He then ordered that Rebecca be given Pitocin, a uterine-contracting drug. He went back to his office at about 12:30 p.m. and did not return to the labor room until immediately before the delivery.

Once the drug, designed to enhance the labor progress, caused Rebecca's contractions to intensify, the monitor again indicated Chad was experiencing fetal distress. The strips were described as "agonal." Even Dr. Hajjar's experts testified that by 1 p.m. intervention was essential, and that after 1:30 p.m. there was no chance for Chad to be delivered without severe brain damage. When Chad was ultimately delivered at close to 3 p.m., it took nearly 30 minutes to resuscitate him. He sustained severe irreversible brain damage at birth due to in-utero asphyxia. He was transported to the University of Kentucky Medical Center where he lived for several weeks dependent on a respirator and other life support devices. He required surgery to keep from choking to death. He was then moved to the Home of the Innocents in Louisville where, on November 20, 1990, he died.

On April 2, 1991, Mark Reffitt and Rebecca Reffitt, individually, and Rebecca, as the administratrix of the estate of Chad Reffitt, commenced this action in the Boyd Circuit Court naming as defendants, Ashland Hospital Corporation (King's Daughters'), Naji Hajjar and Rita Amburgey. Amburgey was the head obstetrical nurse at King's Daughters' and personally attended to Rebecca on August 1, 1990.

In the fall of 1991, the Reffitts' marriage was dissolved. On January 6, 1992, Mark Reffitt was killed during the commission of a robbery. On February 20, 1992, Donald Reffitt, Mark Reffitt's father and the administrator of his estate, moved to dismiss the claims

of Mark against the various defendants. This motion was sustained on February 28, 1992.

In May 1992, Rebecca Reffitt settled her claims against King's Daughters' and Nurse Amburgey. On September 28, 1992, Rebecca's trial against Hajjar commenced, lasting for seven days. In his defense Hajjar offered proof that there was no clear indication that intervention was necessary in the morning, and that he was entitled to rely on the observations of Amburgey, an experienced obstetrical nurse, to know when to be at Reffitt's bedside. His expert established that he could have saved Chad but for Amburgey's failure to communicate the dire condition of Chad Reffitt after 1 p.m. At the conclusion of the trial, Hajjar moved for a directed verdict, which motion was overruled. Reffitt did not initially move for a directed verdict and the trial court entertained motions pertaining to the instructions.

Reffitt had tendered an instruction requiring the jury to find Hajjar vicariously responsible for the negligence, if any, attributable to Nurse Amburgey pursuant to the holding in *City of Somerset v. Hart*, Ky., 549 S.W.2d 814 (1977). The trial court read the *City of Somerset* case and came to the conclusion that it did not matter whether Chad's condition was caused by Hajjar's independent negligent acts or by the negligence of Nurse Amburgey, as in either event Hajjar would be liable under the simultaneous (or borrowed) servant doctrine. At that point in the discussion, it occurred to Reffitt's attorney to move for a directed verdict on liability, which the trial court granted over Hajjar's strenuous objection. The trial court likewise refused Hajjar's request to instruct the jury to apportion liability between Hajjar and the hospital.

The jury, informed that Hajjar was responsible for his own negligence, if any, as well as that of Nurse Amburgey, was instructed only on the issue of damages, including punitive damages. The jury's award included $95,504.94 [1] for medical expenses, $30,000 for Rebecca's loss of companionship and $590 expended for funeral expenses. The award included nothing for Rebecca's mental and physical suffering, nothing for the destruction of Chad's power to earn money and nothing for Chad's pain and suffering during his four-month existence. Reffitt moved for a new trial on the issue of damages only. Hajjar moved for a new trial or for a judgment notwithstanding the verdict, or for a credit against the $126,094.94 jury verdict for sums paid by the settling defendants.[2] All motions were overruled by order of October 30, 1992. Reffitt has appealed and Hajjar has cross-appealed.

In her appeal Reffitt argues the trial court erred in failing to award her a new trial on damages pursuant to the holding in *Turfway Park Racing Association v. Griffin*, Ky., 834 S.W.2d 667 (1992). Because we are of the opinion that the trial court erred in failing to allow the jury to determine the percentage of Hajjar's fault for the injuries suffered by Rebecca and Chad Reffitt by failing to give an apportionment instruction, this issue is rendered moot. Nevertheless, we will address the issue to ensure there is no repeat of this error on remand.

■ Hajjar's argument, that an award of zero for Chad's destruction of power to earn money is entirely appropriate, is the same as his successful argument before the jury. He relies on the old cliche: the apples don't fall far from the tree. Reffitt, as the plaintiffs in *Turfway Park*, offered the testimony of a vocational expert, John Tierney, who after analyzing many factors, opined that Chad lost earnings in excess of $500,000. Also, like the defendant in *Turfway*, Hajjar offered no expert testimony on the issue but attempted to make Tierney's testimony appear unreasonable in light of negative evidence concerning Chad's parents. This evidence includes the fact that Mark Reffitt, Chad's father, was a convicted felon and died at an early age,[3] and that Rebecca was a recipient

---

1. The jury was aware that the state had a lien against the judgment for the medical expenses.

2. Although the settlement amount is not in the record, the motion alleges that it was in excess of the jury verdict.

3. The jury was not told that Mark was killed

of food stamps and medicaid and at times lived off the largess of family members, particularly Mark's parents. There was an attempt to inform the jury that Rebecca had a criminal record [4] and the jury knew Rebecca smoked marijuana prior to her pregnancy. Finally Hajjar presented evidence of the Reffitts' tax returns which showed no earnings in 1990, $2,440 in 1989, and $750 in 1988.

While *Turfway* makes it clear that a jury is not "compelled to return a verdict dictated by economic expert testimony," neither is it proper in a wrongful death action to award nothing for destruction of earning power "unless there is evidence from which the jury could reasonably believe that the decedent possessed *no power to earn money.*" *Id.* at 671. (Emphasis added). The evidence referred to in *Turfway* to defeat a claim for these damages is evidence "of a disability *so profound* as to render him incapable of earning money upon reaching adulthood." *Id.* (Emphasis added). The evidence in this case is uncontradicted that, but for the failure of the defendants to recognize the fetal stress Chad was suffering during the labor process and to timely intervene to prevent permanent brain damage, Chad would be a normal, healthy child like his identical twin, Colby. While the jury was seduced by Hajjar's argument that Chad would never amount to anything because of his parents' values and life style, we find this argument repugnant as a matter of law and offensive to cherished, although oft fanciful, principles upon which our society is based. Thus, on retrial the jury will be required to award some amount to compensate Chad's estate for his destruction to earn money, and Hajjar may not be allowed to argue for a zero award.

Reffitt also alleges the trial court erred in ruling that she could not call twelve witnesses during her case in chief. Other than stating that this ruling occurred during a conference in chambers, Reffitt has not specifically referred us to where in the record this issue has been properly preserved. CR

76.12(4)(c)(iv). A synopsis of the witnesses' testimony leads us to conclude that most of the witnesses were relatives of Reffitt who came to the hospital who were going to testify about the actions or inaction of Nurse Amburgey. Since Reffitt had settled her claims against the nurse and the hospital, we are not certain why she would even want to present testimony that would point the finger at Amburgey. On retrial, the court is to exercise its sound discretion in allowing any of these witnesses to testify. As Hajjar points out, the evidence they had to offer was repetitive and not germane to the issue of whether Hajjar breached any standard of care. Finally, the other issues raised by Reffitt have become moot by our holding on Hajjar's cross-appeal and, in our opinion, concern matters not likely to reoccur during a new trial.

▪ Without any doubt Dr. Hajjar is correct in his cross-appeal that the Boyd Circuit Court misapplied the holding in the *City of Somerset* case, *supra,* in directing a verdict of liability wholly against him. In *City of Somerset,* the plaintiff, Hart, sustained injury when, following a surgical procedure, a scalpel blade was left in his abdomen. 549 S.W.2d at 815. Hart sued the doctor and the hospital which had provided the nurses who assisted during the surgery. The jury apportioned the verdict 40% against the doctor and 60% against the hospital. The hospital appealed, seeking to be absolved of its liability under the borrowed servant doctrine. The Court held that the hospital could not escape liability under the borrowed servant doctrine if the acts of the hospital employee were of mutual benefit to both the surgeon and the hospital. The Court stated that "[f]requently, if not most often, the nurse or other employee who is temporarily lent to the physician or surgeon, in every realistic sense, continues to carry on [their] hospital duties." *Id.* at 818. The Court upheld the 40%/60% apportionment, a significant fact overlooked by the trial court in the instant

---

during the commission of yet another felony. Discussion of Hajjar's allegation of error in this regard is at pages 15–16, *infra.*

4. Hajjar's counsel asked her if she had ever been convicted of a crime, knowing Rebecca had been

convicted of a misdemeanor. She had been convicted of a misdemeanor offense for shoplifting. Before she could answer, the objection was sustained. No doubt, the jury got the impression Hajjar intended to convey.

case. While the *City of Somerset* case states that the nurse's negligence could be chargeable both to the doctor and hospital, the holding does not by any stretch of the imagination contemplate charging total liability to the doctor where the servant and co-master have settled prior to trial, and/or where the evidence fails to "clearly establish that the defendant physician neither selected nor supervised the nurse nor was ... personally present" when she committed negligent acts. *Massey v. Heine,* Ky., 497 S.W.2d 564 (1973). Clearly a jury question was presented as to whether Hajjar was liable for Amburgey's acts.

■ Also, the court's failure to instruct the jury to apportion fault for Chad's injuries, which resulted in his death, between the hospital and doctor not only violated the principle that one is liable for only those damages equal to his degree of fault, "no more and no less," *Stratton v. Parker,* Ky., 793 S.W.2d 817 (1990), and the statutory directive, KRS 411.182, but obviously confused the jury.[5] Both parties initially offered an apportionment instruction. Reffitt is now in the untenable position of arguing that such an instruction was not required as apportionment is no longer an option for the court to exercise, but is mandatory upon the request of any alleged negligent party. *See Dix & Associates v. Key,* Ky., 799 S.W.2d 24, 28 (1990).

In the recent case of *NKC Hospitals, Inc. v. Anthony,* Ky.App., 849 S.W.2d 564 (1993), a jury apportioned fault between the doctor and hospital on a 65%/35% basis. The plaintiff's decedent presented herself at the hospital, 26-weeks pregnant and suffering severe abdominal pain. The failure to timely diagnose her condition was due to a ruptured appendix resulted in the young woman's death due to acute respiratory distress syndrome. In its appeal the hospital attempted to escape liability arguing the doctor's conduct was the superseding cause of its patient's ultimate demise. We held as follows:

> All qualified health care providers, within the range of care for Mrs. Anthony, were under a duty to exercise their senses and

intelligence to investigate and inspect for potential dangers to her. They did not. Their voluntary ignorance of her condition will grant no relief because voluntary ignorance is negligence. Knowledge and the opportunity to acquire knowledge of the peril and risks involved were the fundamental basis of the duty owed to Mrs. Anthony. The defense that the hospital's nurses were only following a "chain of command" by doing what Dr. Hawkins ordered is not persuasive. The nurses were not the agents of Dr. Hawkins. All involved had their independent duty to Mrs. Anthony.

■ There is no question that Rebecca Reffitt was entitled to a directed verdict of liability as Hajjar's own experts opined that if he had intervened, either by caesarian section or forceps delivery by 1 p.m. to 1:20 p.m., Chad as well as Colby would have been delivered "neurologically intact." However, as *NKC* makes clear, the duties owed to Reffitt and her twins by Nurse Amburgey were independent of the duties owed by Hajjar. There was evidence from which a jury could determine Hajjar vicariously liable for Amburgey's acts, but that was a determination for the jury, and in any event he was entitled to an apportionment instruction vis-a-vis the hospital as he requested. *Floyd v. Carlisle Construction Company,* Ky., 758 S.W.2d 430 (1988).

We cite the *NKC* case not only as authority for the conclusion that the court erred in failing to instruct the jury, but also to address Hajjar's argument that the trial court erred in not directing a verdict in his favor. As stated before, Hajjar was not present after 1 p.m. when, according to his experts, the baby was compromised by the labor process. He and his experts testified that Amburgey neglected to keep him informed and that, but for Amburgey's negligence, Hajjar could have delivered Chad Reffitt prior to any neurological damage. In addition to the plaintiff's expert witnesses, who testified that intervention was indicated by 10:30 a.m., and

---

5. A note from the jury contained the following:    "Are we judging Dr. H. only?"

other evidence of Hajjar's negligence,[6] the *NKC* case clearly holds that Hajjar cannot escape liability by remaining ignorant of his patient's condition. As the treating physician of a high-risk patient, with knowledge that fetal distress had occurred earlier in the day, Hajjar cannot insulate himself from liability by leaving his patient's side and feigning ignorance of the ultimate extreme peril she and her child later experienced. Although Hajjar left Reffitt's bedside at 12:30 p.m., anticipating delivery of Chad within the hour, he made no effort to discover why labor was not progressing as he believed it should. He acknowledges phone calls from Amburgey but alleges she did not alert him of the crisis. He admittedly did not ask questions appropriate to apprise himself of the need to be at bedside, insisting that he was entitled to rely on Amburgey. Additionally, Reffitt's experts testified that Hajjar should have been aware that on August 1, 1990, Amburgey was suffering from something other than a bad day. She was exhibiting signs of severe burn-out and failed to properly read the fetal monitoring strips in the morning. Thus, in addition to evidence of other independent acts of Hajjar's negligence, there is evidence that Hajjar was negligent in relying on Amburgey in the first instance to keep him properly informed of Reffitt's condition.[7] There is overwhelming evidence of Hajjar's negligent acts and his argument that he was entitled to a directed verdict is without any merit. In fact, if on remand the evidence is the same, the trial court should direct a verdict of liability against Hajjar for his own negligent acts in favor of Reffitt.

Hajjar's argument that the trial court erred in failing to give him a credit against the verdict for sums already paid by the hospital is mooted by our conclusion that a new trial is required on the issues of Hajjar's vicarious liability for Amburgey's negligence, if any; apportionment of damages among Hajjar, Amburgey and Kings' Daughters; and the appropriate amount of damages. *Burke Enterprises, Inc. v. Mitchell*, Ky., 700 S.W.2d 789 (1985), is of little value as, though it required a credit against the verdict, no apportionment instruction was given in that case and none was requested. As stated, both Hajjar and Reffitt originally requested an apportionment instruction. There is no possibility of salvaging this verdict by giving credit to Hajjar for sums paid by the hospital.

■ Hajjar has a laundry list of alleged evidentiary errors that entitles him to a new trial. There is no merit to many of Hajjar's arguments that he was prejudiced by any of these rulings in light of the paucity of the verdict. However, because these issues could arise on remand, we will comment. Hajjar had two basic trial tactics: first he attempted to blame Amburgey for Chad's injuries; second, he attacked Reffitt's character, portraying her as an antagonist in a soap opera to convince the jury she was not deserving of much in the way of damages. To accomplish the latter tactic, Hajjar introduced evidence that Reffitt had, prior to her pregnancy, smoked marijuana, was married to a felon, lived off family members, couldn't get along with her in-laws and had restricted their visitation with Colby. In his appeal Hajjar complains that he was not allowed to introduce further damaging evidence. For example, he alleged the trial court erred in denying his request to introduce the existence and contents of a lawsuit commenced by Reffitt's in-laws to obtain visitation with the surviving twin, Colby. Hajjar makes the incredible statement that this lawsuit was "directly relevant to her pending claim for loss of companionship, love, services and assistance of Chad Reffitt." Hajjar's reliance on *Barrett v. Commonwealth*, Ky., 608 S.W.2d 374 (1980), is entirely misplaced. *Barrett*, a criminal case, held that the defendant's "past differences" with a family member were material to the relative's motives in testifying against the defendant. Failure to allow the defendant to explore the relative's motives impacted his constitutional right to

---

6. Reffitt's experts testified of many acts by Hajjar which deviated from the appropriate standard of care.

7. It is this evidence, if believed by the jury, that would support an assessment of liability against Hajjar for Amburgey's negligence, as well as his own.

confront witnesses against him. *Id.* at 376. In the instant case, Reffitt did not call Don Reffitt to testify on her behalf. *Hajjar* called Don Reffitt to establish that Reffitt's in-laws had spent a considerable amount of time with Colby prior to April 1992, when some event caused a breakdown between Reffitt and her in-laws. Hajjar used this evidence to argue that Reffitt didn't spend 30% of her time with Colby, so she didn't suffer much for the loss of Chad! There was certainly no error in refusing to allow Hajjar to inform the jury about the grandparents' law suit to seek visitation with Colby. This is an entirely collateral matter that has no relevance to the issues in this trial. Even without that evidence, Hajjar was allowed to introduce evidence of the rift between Reffitt and her in-laws, which has little, if any, probative value on her damages and which merely served to prejudice Reffitt. On remand, this type of evidence should be closely monitored by the trial court.

■ Hajjar complains that he was improperly limited from cross-examining Reffitt on her use of marijuana prior to her pregnancy. Again, this evidence, like that of her cigarette smoking, was of no relevance to this trial. The evidence was that *both* twins were healthy and that Chad, who's cord was wrapped around his neck, suffered such compressions during labor that he was asphyxiated in utero. But for the failure of the health care professionals to timely recognize this fact and properly intervene, Chad would have been fine. Hajjar's attempt to have the jury know Reffitt may have smoked marijuana in the past was another attempt to prejudice her in the eyes of the jury. The trial court made the proper ruling in this regard.

Hajjar argues he was limited in his direct examination of Sherry Young, Reffitt's sister-in-law, about Reffitt's use of marijuana. He states in his brief that the trial court refused to allow him to ask Young about Reffitt's use of marijuana during her pregnancy. Our review of the tape of Hajjar's examination of Young reveals the contrary. Hajjar asked

and Young testified that Reffitt had used marijuana prior to her pregnancy but not during her pregnancy. There is no evidence from any source that Reffitt used marijuana during her pregnancy and *all* inference to her prior use of this drug should be avoided on retrial.

■ Incredibly Hajjar argues that he was prejudiced by the court's pretrial ruling that prohibited him from mentioning the circumstances of Mark Reffitt's death.[8] Mark's claims were dismissed prior to trial and we cannot fathom what relevance the nature of his death has on the issue of Hajjar's negligence or Rebecca's damages. That Chad Reffitt's father was killed during a felony and that he killed someone else during the commission of that felony is not the type of evidence, as Hajjar contends, relevant to Chad's lost earning capacity. *Turfway, supra* at 871. That Rebecca Reffitt was married to a felon does not diminish her damages caused by the loss of her son. There was no error in this regard.

■ We agree with Hajjar that portions of a videotape shown to the jury were inappropriate. Reffitt was allowed to play for the jury a videotape that lasted about 11 minutes. The first part of the tape had footage of Chad at the U.K. Medical Center and some still photographs of Chad. In contrast the tape would show pictures of Colby at the same stage of development. There is a brief portion showing Chad in his coffin and then the bulk of the tape depicts Colby at various milestones and holidays, including his first birthday party. During this portion of the tape a large black dot takes up about a third of the screen, symbolic, of course, of the then deceased Chad. Its theatrical value is impressive but, as evidence, it's offensive.

On remand we believe Reffitt is entitled to show any portion of the video that depicts Chad Reffitt, with the exception of the coffin scene. She is entitled to show the jury what his 120-day existence was like for purposes of establishing damages for his pain and

---

**8.** Hajjar gratuitously tells us that the brother of a circuit court judge died as a result of a gunshot wound from Mark Reffitt during the commission of a robbery. Apparently Hajjar has a notion that such tragic information concerning the judicial brotherhood would unduly influence us in his favor.

suffering. The rest of the tape, while it certainly did not prejudice Hajjar in this trial, could potentially inflame or prejudice the jury on retrial and should be inadmissible. All other evidentiary issues raised in Hajjar's brief but not discussed herein have been determined to be without merit.

 Finally, we agree with Hajjar that the evidence will not support an instruction on punitive damages. While the evidence of Hajjar's negligence was, in our opinion, overwhelming, there was no evidence that Hajjar's actions meet the standard set forth in KRS 411.184 to allow for an award of punitive damages. The instruction parroted the statutory definition of malice, that is "conduct that is carried out by the defendant both with a flagrant indifference to the rights of the plaintiff and with a subjective awareness that such conduct will result in human death or bodily harm."

Reffitt, in her opening statement, alleged that Hajjar did not pay sufficient attention to her while in labor because she was a welfare patient and that Hajjar received less money for treating welfare patients. Whether Hajjar has such prejudices or not, there is no evidence that Hajjar discriminated against Reffitt because of her status as a welfare recipient or acted towards her or Chad with a "flagrant indifference" to their rights. Thus, on remand, unless the evidence is substantially different, no punitive damage instruction should be given.

Accordingly, the judgment of the Boyd Circuit Court is reversed and remanded for a new trial consistent with this opinion.

HUDDLESTON, J., concurs.

JOHNSON, J., concurs in result only.