AS MODIFIED: AUGUST 27, 2009
RENDERED: APRIL 23, 2009
TO BE PUBLISHED

# Supreme Court of Kentucky

2004-SC-001015-DG
AND
2005-SC-000834-DG



DATE 8/27/09 Kelly Klaber D.C.

GREGORY B. NAZAR, M.D., ET AL.          APPELLANTS/CROSS-APPELLEES

ON REVIEW FROM COURT OF APPEALS
V.          CASE NO. 2003-CA-001110-MR
JEFFERSON CIRCUIT COURT NO. 00-CI-006591

SHEILA BRANHAM, EXECUTRIX OF
THE ESTATE OF ROE BRANHAM          APPELLEE/CROSS-APPELLANT

**OPINION OF THE COURT BY SPECIAL JUSTICE JEFFREY C. MANDO**

**<u>REVERSING</u>**

This is an appeal from a defense verdict in a medical malpractice action. Appellee/Cross-Appellant, Sheila Branham as Executrix of the Estate of Roe Branham [hereinafter "Branham"] alleges that Appellant/Cross-Appellee, Dr. Gregory B. Nazar [hereinafter "Dr. Nazar"] committed medical malpractice by failing to remove an object from Roe Branham's scalp following surgery. The alleged professional negligence occurred at Norton Audubon Hospital [hereinafter "Norton"] on February 27, 2000 during an operation in which a malignant tumor was removed from Branham's brain. The surgery was largely a success, with nearly 95-100 percent of the tumor having been extracted.

Following surgery, however, Branham complained of pain in his head, which was initially dismissed as an attendant aspect of his surgery. When the pain continued for several weeks Branham sought further medical attention. Tests revealed that a Durahook, a small, metallic object used to hold soft tissues apart during an operation, was left in Branham's scalp. On August 10, 2000, the Durahook was surgically removed from Branham's scalp without further complications. Branham incurred $11,900.00 in medical expenses as a result of the surgery.

After his second surgery, Branham filed suit in Jefferson Circuit Court, naming Dr. Nazar, Dr. Nazar's medical practice, and Norton as Defendants. Branham alleged that the Defendants had committed medical malpractice by failing to remove the Durahook from his scalp after surgery. He further alleged that both Dr. Nazar and Norton were vicariously liable for the nursing staff's failure to remove the Durahook from his scalp. Following discovery, Branham settled his claims against Norton and the trial court entered an agreed order dismissing them, while preserving Branham's claims against Dr. Nazar.

Shortly after this settlement, Branham moved for summary judgment against Dr. Nazar, arguing that he was negligent as a matter of law for having left the hook in his scalp during surgery. In the alternative, Branham argued that Dr. Nazar was vicariously liable for the failure of the nursing staff to remove the hook. In opposing Branham's motion, Dr. Nazar presented affidavits from two experts: Harold Smith, M.D., a neurosurgeon, and Susan Howe, R.N., a surgical nurse. Both witnesses stated that Dr. Nazar had

satisfied the applicable standard of care, even though the Durahook remained in Branham's scalp following surgery. As a result, the trial court denied Branham's dispositive motion.

At trial, Dr. Nazar testified that he placed the hooks in Branham's scalp and was supposed to remove them. Dr. Nazar also stated, however, that he did not count the hooks himself because it was general practice for the nursing staff to do so. Dr. Nazar further testified that he had no reason to assume that any of the Durahooks had been left in Branham's scalp. Durahooks are placed in the patient's scalp and fastened with a rubber band under the operating table. If the fastening comes loose, Durahooks can slide under the tissue and become concealed during surgery. Because a towel is placed over the operating area, Dr. Nazar was unable to see if a Durahook became unfastened. Furthermore, Dr. Nazar believed that the Durahooks were included in the nurses' "sharps" count, and at the end of Branham's surgery, he relied upon the nurses' assurance that all of the sharps had been removed.

Nurse Susan Howe, an expert witness called by Dr. Nazar, testified that it was the nursing staff's duty, and not the surgeon's, to ensure that all "sharps" were accounted for after surgery. In her opinion, the nurses should have counted the hooks as sharps despite the fact that they were not explicitly mentioned in Norton's hospital protocol. Howe also testified that she knew of no customs or practices which required surgeons to count sharps during or after surgery. Thus, Howe concluded that Dr. Nazar reasonably relied on the

3

nurses and scrub technician to count the Durahooks during Branham's surgery.

Dr. Nazar's second expert, Dr. Harold Smith, testified that the nurses should have counted the Durahooks as sharps because it was typically the duty of the nursing staff to account for sharps after surgery. Dr. Smith, therefore, opined that Dr. Nazar was not responsible for counting the sharps and was justified in relying on the nursing staff to conduct the count.

Nurse Anna Ball and surgical technician Meshon Daniels, who assisted Dr. Nazar during the surgery, testified that they did not count the hooks because hospital policy did not require it. Norton's protocol listed several items which were specified as "sharps," including: "needles, blades, bovie tips, safety pins, injectables," but not Durahooks. Ms. Ball further testified, however, that if she had counted items and discovered that one was missing, she would have promptly notified Dr. Nazar so that he and the nursing staff could search for the missing item until it was located.

Following the presentation of this evidence, the trial court denied the parties' respective motions for directed verdict. The trial court also refused to instruct the jury on Branham's vicarious liability theory against Dr. Nazar. The jury then deliberated and returned a verdict in favor of Dr. Nazar, finding that he had not breached the standard of care.

On appeal, the Court of Appeals reluctantly reversed the trial court's denial of Branham's motion for summary judgment. *See Branham v. Nazar,* No. 2003-CA-001110-MR, at *2 (October 22, 2004). An *en banc* Court of

4

Appeals concluded that under <u>Laws v. Harter</u>, 43 S.W. 2d 449 (Ky. 1975), Dr. Nazar was negligent as a matter of law for having left the Durahook in Branham's scalp. As such, summary judgment should have been granted as to Dr. Nazar's liability and the jury should only have addressed the question of damages. *Id.* at 16-17. From this opinion, Dr. Nazar filed a motion for discretionary review, asking this Court to reinstate the jury verdict in his favor. Branham filed a cross-motion for discretionary review on the vicarious liability issue. We granted both motions.

## A.    Dr. Nazar's Individual Liability

In defense of the Court of Appeals' decision, Branham argues that under <u>Laws v. Harter</u>, 534 S.W.2d 449 (Ky. 1975), Dr. Nazar was negligent as a matter of law for permitting the Durahook to remain in his scalp after surgery. In *Laws*, a surgical sponge was left in the plaintiff following thoracic surgery performed by the defendant surgeon. *Id.* at 450. Before the incision in the plaintiff's body was closed, a nurse's count revealed that one of the sponges was missing. *Id.* After searching the operating room for an extended period of time, the sponge still could not be located. *Id.* The surgeon decided that under the circumstances it would be best to close the patient despite the fact that the sponge was missing. *Id.* Following the surgery, X-rays revealed that the missing sponge remained in the plaintiff's body. *Id.*

Upon discovering the sponge, the plaintiff sued the surgeon, alleging that he was negligent as a matter of law. *Id.* The surgeon argued that he had satisfied the standard of care of a reasonably prudent doctor by deciding to

5

close the patient, despite the missing sponge. *Id.* The former Court of Appeals, however, was not convinced, and held that the reasonableness of the doctor's decision was not relevant. *Id.* at 450-51. Instead, the Court held that the surgeon was negligent per se because "[h]owever exemplary the care given to appellant after discovering that a sponge was missing, the fact remains that when the incision through the diaphragm was closed a sponge was left in the abdomen." *Id.* at 450. Accordingly, the Court remanded to the trial court for a new trial addressing only the issue of plaintiff's damages. *Id.* at 451-52.

Dr. Nazar argues that despite *Laws*, retained foreign object cases are generally resolved under a *res ipsa loquitur* standard under Kentucky law. Under this standard, juries may – but are not required to - infer negligence from the fact that a surgical item was left in a patient's body. While the retained foreign object is evidence of negligence, the jury is free to determine the ultimate issue of the surgeon's liability from the evidence presented at trial. In support of his argument, Dr. Nazar relies upon <u>Chalothorn v. Meade,</u> 15 S.W.3d 391 (Ky. App. 1999), where the Court of Appeals reversed a trial court order holding a doctor negligent as a matter of law. In *Chalothorn*, the plaintiff required a cesarean section to deliver her baby. *Id.* at 392. After the baby was delivered, the nurse informed the doctor that one surgical sponge was missing. *Id.* When a search revealed that a sponge was located on the baby's body in the nursery, a nurse told the doctor that the count was correct and the doctor closed the incision in the plaintiff's body. *Id.* Later, it was discovered that what was believed to be a sponge on the baby's body was not a sponge at all

6

and that in fact one sponge was still missing. *Id.* The missing sponge was eventually discovered in the plaintiff's abdomen and was removed without complications. *Id.*

After the sponge was discovered, the plaintiff sued the doctor, arguing that he was negligent as a matter of law for having left the sponge in her body. *Id.* at 393. Relying on *Laws*, the trial court granted summary judgment to the plaintiff and the doctor appealed. *Id.* The Court of Appeals reversed, ruling that because the doctor had presented evidence of his compliance with the standard of care summary judgment was inappropriate. *Id.* The appellate court distinguished *Laws* because in that case the doctor was aware that a sponge was missing when he decided to close the patient. *Id.* The doctor in *Chalothorn*, on the other hand, relied on a nurse's sponge count which informed him that all the sponges had been located. *Id.* As such, the appellate court remanded with instructions for the jury to determine the doctor's liability. *Id.*

In the present case, the Court of Appeals held that *Laws* mandates the application of a negligence per se standard in all retained object cases, and overruled *Chalothorn*. *Branham v. Nazar,* No. 2003-CA-001110-MR, at *19 (October 22, 2004). In doing so, the court was influenced more by the binding authority of *Laws* than by the reasonableness and wisdom of its holding. *See id.* Indeed, the court acknowledged that it was troubled by many aspects of the negligence *per se* rule, but noted that it lacked the authority to formally adopt the *res ipsa loquitur* approach in Kentucky. *Id.* Because we are similarly

7

troubled by the impact that the negligence per se approach would have on Kentucky medical malpractice jurisprudence, we adopt the *res ipsa loquitur* approach and hold that juries should generally be permitted to determine a healthcare professional's liability in a retained foreign object case. Our decision to adopt this approach was influenced by a number of reasons.

First, the negligence per se standard is inconsistent with Kentucky's pure comparative fault system. Nine years after *Laws* applied the negligence per se rule, the Supreme Court in *Hilen v. Hays* joined the majority of American jurisdictions in adopting comparative fault. *See* 673 S.W.2d 713, 720 (Ky. 1984). Under comparative fault, a jury is permitted to allocate fault to each party to the action, considering both the nature and conduct of each party at fault and the extent of the causal relationship between the conduct and the damages claimed. *Id.* at 719. The negligence per se rule announced in *Laws* takes the issue of individual accountability away from the jury and inexplicably ascribes fault to the surgeon, regardless of whether the evidence suggests otherwise. As the Court of Appeals noted, "*Laws* assumes that negligence had to have occurred so, therefore the surgeon must have been negligent." *Branham v. Nazar,* No. 2003-CA-001110-MR.

This conflict is significant because comparative fault analysis will inevitably arise in the vast majority of retained foreign object cases. Usually, retained foreign object cases originate from medical operations in which multiple medical care professionals perform a variety of tasks. As illustrated by the present case, any number of people including the surgeon,

8

anesthesiologist, nursing staff, and other hospital staff may be at fault for having left an offending item in a plaintiff's body. The varied business relationships which exist at modern hospitals further complicate the issue. Because of these various types of relationships, no two surgical procedures are exactly alike, and the duties and responsibilities of the medical care professionals will likely depend on the specific facts of each case. A per se rule cannot account for these differences and would unfairly ascribe fault to surgeons, regardless of their responsibility for the plaintiff's injury.

The *res ipsa loquitur* approach avoids this unfairness by permitting juries to infer negligence from the fact of the retained foreign object, while granting them the latitude to analyze other facts and evidence relevant to liability. As such, juries are free to analyze the reliability and veracity of the defendant's expert witnesses and weigh it against the likelihood that the surgeon was negligent in failing to remove an object from the plaintiff's body during surgery. The *res ipsa loquitur* standard simply provides a more equitable method for resolving retained foreign object cases.

In addition, the *res ipsa loquitur* approach is more consistent with most of our caselaw. Of all the retained foreign object cases in Kentucky, only *Laws* applied the negligence per se rule. Before *Laws*, Kentucky courts repeatedly held that a jury should decide whether a surgeon is liable for permitting a surgical item to remain in a patient after surgery. *See* <u>Samuels v. Willis</u>, 118 S.W. 339, 342 (Ky. 1909); <u>Barnett's Adm'r v. Brand</u>, 177 S.W. 461, 464 (Ky. 1915); <u>Carter v. Harlan Hospital</u>, 128 S.W.2d 174, 176 (1939).

9

Unfortunately, the Court in *Laws* made no effort to distinguish these decisions or to question the significance of this line of contrary precedent. Further, the court cited no legal authority, from Kentucky or any other jurisdiction, to support its per se rule. The lack of analysis and supporting authority in *Laws* does little to instill confidence in the wisdom of its approach.

The lukewarm reception of *Laws* by subsequent Kentucky courts further undermines our faith in the negligence per se rule. Just two years after *Laws*, this Court noted that a *res ipsa loquitur* standard should apply in a case where a surgical blade was left in a patient's body during an operation to remove a kidney stone. *See* City of Somerset v. Hart, 549 S.W.2d 814, 817 (Ky. 1977). This theme continued in *Chalothorn*, where the Court of Appeals refused to apply the negligence per se rule and distinguished *Laws* on its facts. *See* 15 S.W.3d at 393. Even in the process of applying the negligence per se rule in the present case, the Court of Appeals expressed disapproval of *Laws* and argued for its hasty demise. *Branham v. Nazar*, No. 2003-CA-001110-MR. As such, to promote a negligence per se rule now would require us to adopt a rule that has never been well-received by Kentucky courts. Instead, we reaffirm the caselaw which leaves the issue of a surgeon's liability to the jury and adopt the *res ipsa loquitur* approach for Kentucky retained foreign object cases.

Our adoption of the *res ipsa loquitur* standard renders the continued viability of *Laws* questionable. Though *stare decisis* inspires in this Court both humility and respect for established precedent, it "does not commit us to the sanctification of ancient fallacy." *Hilen*, 673 S.W.2d at 717. As Justice Leibson

10

noted, "[t]he common law is not a stagnant pool, but a moving stream." *Id.* (citing City of Louisville v. Chapman, Ky., 413 S.W.2d 74, 77 (1967)). When rules, as the one announced in *Laws*, prove unworkable or inconsistent with other law, it is the duty of this Court to clarify the common law and direct its development. Because the negligence per se rule announced in *Laws* is inconsistent with the *res ipsa loquitur* approach we adopt today, it is now overruled.

Because we have rejected the *per se* rule in retained foreign object cases, the trial court was correct in refusing to hold Dr. Nazar negligent as a matter of law for failing to remove the Durahook from Branham's scalp. Branham, however, still argues that trial court should have granted his motion for summary judgment or his motion for directed verdict. Summary judgment is only appropriate where the moving party establishes that there is no genuine issue of material fact warranting resolution by a jury. *See* Ky. R. Civ. P. 56.03; *see also* Steelvest, Inc. v. Scansteel Service Center, Inc., 807 S.W.2d 476, 482 (Ky. 1991). Similarly, motions for directed verdict are appropriate if the moving party can establish that based on the evidence presented at trial, reasonable minds could not differ on the proper resolution of the case. *See* Ky. R. Civ. P. 51.01; Spivey v. Sheeler, 514 S.W.2d 667, 673 (Ky. 1974). Both standards require, however, the reviewing court to construe the facts in favor of the non-moving party.

Dr. Nazar presented adequate evidence both before and during trial which created fact issues sufficient to defeat Branham's motions. Before trial,

11

Dr. Nazar submitted expert affidavits stating that he complied with the standard of care, despite the failure to remove the Durahook after surgery. At trial, Dr. Nazar presented one expert who testified that it was common practice for doctors to rely on nurses to account for all sharps used during surgery and another expert who testified that it was the nursing staff's obligation to count the Durahooks even though these items were not listed specifically in the Norton protocol. Even though the presence of the Durahook in Branham's scalp constituted prima facie evidence of negligence, the expert testimony created a question of fact regarding Dr. Nazar's liability for Branham's injuries. Accordingly, the trial court did not err in denying Branham's motions for summary judgment and directed verdict.

## B. Dr. Nazar's Vicarious Liability

Having determined that the jury was correctly allowed to resolve the issue of Dr. Nazar's individual liability, we must now determine whether the jury should have been permitted to address his vicarious liability. The trial court twice rejected Branham's contentions that Dr. Nazar is vicariously liable for the conduct of Norton's nursing staff during his operation. First, the court denied his motion for summary judgment based on the doctrine of *respondeat superior*, and second the court refused to instruct the jury on that theory at the close of evidence. *Branham v. Nazar*, No. 2003-CA-001110-MR. Because it ruled that Dr. Nazar was liable as a matter of law, the Court of Appeals did not address this issue in its majority opinion. On appeal, however, Branham renews his claim that Dr. Nazar should be held vicariously liable for the failure

12

of the nursing staff to fulfill their duties to remove the Durahook from his scalp.

To hold Dr. Nazar vicariously liable for the nursing staff's negligence, Branham must establish that the nurses were Dr. Nazar's agents. "Where the facts are in dispute and the evidence is contradictory or conflicting, the question of agency, like other questions of fact, is to be determined by a jury. However, where the facts [regarding the parties' relationship] are undisputed, the question becomes one of law for the court." Wolford v. Scott Nickels Bus Co., 257 S.W.2d 594, 595 (Ky. 1953). Here, Branham argued to the trial court that Dr. Nazar's admissions that he supervised the nurses and was in charge of the placement and removal of the Durahooks demonstrated that he was in control of the nurses and they were his agents. Disagreeing that those admissions proved an agency relationship, Dr. Nazar contended that the hospital's manual, which directs nurses to follow certain steps when assisting surgeons, and his reliance on the nurses to count the sharps showed that they were not his agents. Thus, the parties did not dispute the facts surrounding Dr. Nazar's and the nurses' relationship—that Dr. Nazar relied on the nurses to count the sharps—they simply disagreed with whether or not these facts established an agency relationship. Therefore, because the facts surrounding the parties' relationship were undisputed in this case, the question of whether an agency relationship existed between Dr. Nazar and the nurses was a question of law for the trial court. *See* CSX Transportation, Inc. v. First National Bank of Grayson, 14 S.W.3d 563, 566 (Ky. App. 1999) ("[a]s the facts

surrounding the relationship between CSXT and CTI are undisputed, the trial court properly made the determination of the issue of agency rather than to submit the question to the jury").

A principal may be held vicariously liable for the negligent acts of his or her agent, but generally is not held liable for the conduct of an independent contractor. Williams v. Kentucky Dept. of Educ., 113 S.W.3d 145, 151 (Ky. 2003). An individual is the agent of another if the principal has the power or responsibility to control the method, manner, and details of the agent's work. *See* City of Winchester v. King, 266 S.W.2d 343, 345 (Ky. 1954). If, however, an individual is free to determine how work is done and the principal cares only about the end result, then that individual is an independent contractor. *See* Pancake v. Cull, 388 S.W.2d 391, 392 (Ky. 1960).

Relying upon *City of Somerset, supra,* Branham argues that nurses are the dual agents of the hospital and the surgeon during surgery. Like the facts in the present case, the plaintiff in *City of Somerset* was a patient who had the unfortunate experience of having a surgical item left in his body during an operation. 549 S.W.2d at 815. Unlike the present case, however, the defendant doctor settled before trial, leaving only the hospital and nursing staff as defendants. *Id.* Because the operating surgeon was "authorized to supervise and direct the staff in the operating room[,]" it was *assumed* that the nurses were his agents. *Id.* at 816. Thus, the hospital defended against liability by arguing that the nurses could not be the agents of the hospital during the surgery because they were the doctor's agents at the time.

14

This Court rejected the hospital's argument and held that though the nurses were the "borrowed servants" of the surgeon during the operation, they remained the agents of the hospital. The Court noted that under traditional agency law, the issue of control is determinative, and since the nurses were paid, trained, and employed by the hospital their agency status was clear. City of Somerset, 549 S.W.2d at 816. In borrowed servant cases, agency for one party is only destroyed by agency for another if the fulfillment of one role requires the abandonment of the other. Because the nurses' conduct during the operation was in pursuit of the health of the patient, which was the end goal of both the doctor and the hospital, there was no conflict which terminated or suspended the nurses' agency relationship with the hospital. Therefore, the Court concluded that the nurses remained the agents of the hospital even if they were the surgeon's agents for the same act. *Id.* at 817.

Branham suggests that *City of Somerset* requires the conclusion that a surgeon and a hospital are dual principals of the nursing staff which assists the surgeon during an operation. The decision cannot be read to compel such an outcome. In *City of Somerset*, the court held that where there are facts sufficient to support a dual agency relationship, a surgical nursing staff *may* be the dual agents of both a surgeon and a hospital. *See* 549 S.W.2d at 816-17. *City of Somerset* did not displace the traditional inquiry required for all agency determinations, but instead was founded upon it: agency relationships are created when one party has the authority to control the details of another's work. *See Winchester*, 266 S.W.2d at 345; *Pancake*, 388 S.W.2d at 392.

15

Branham was, therefore, required to present evidence of the facts and circumstances which supported his theory that an agency relationship existed between Dr. Nazar and the nursing staff.

As stated above, the trial court should have granted Branham's motion for summary judgment only if it appeared that there was no genuine issue of material fact regarding Dr. Nazar's vicarious liability and that Branham was entitled to judgment as a matter of law. *Steelvest, Inc.,* 807 S.W.2d at 480. Under this standard, Branham was required to show that the members of the Norton nursing staff were Dr. Nazar's agents as a matter of law. This, Branham simply could not do. He relies only on the testimony that as the surgeon during the operation, Dr. Nazar "supervised" the conduct of the nursing staff and the fact that Dr. Nazar "admitted" that he was in charge of the placement and removal of the Durahooks.

Dr. Nazar, however, submitted affidavits which stated that he justifiably relied upon the nursing staff to count the "sharps." Dr. Nazar presented evidence that he relied upon the nursing staff, rather than instructing them on how, to count the sharps because it was common surgical practice to do so. In addition, the hospital's manual lists over seventeen steps for nurses to follow when assisting surgeons during surgery, but no evidence was presented which suggested that Dr. Nazar attempted to augment or supplement the hospital policy with his own direction. The evidence suggests that Dr. Nazar lacked the authority to control the details of the nurses' work, their training, and terms of employment, and that they were not his agents during Branham's surgery. As

16

a result, the trial court correctly concluded that Branham was not entitled to judgment as a matter of law on his vicarious liability theory.

Due to the lack of evidence supporting Branham's vicarious liability theory, the trial court likewise correctly refused to submit the issue to the jury. "A party plaintiff is entitled to have their theory of the case submitted to the jury if there is any evidence to sustain it." Clark v. Hauck Mfg. Co., 910 S.W.2d 247, 250 (Ky. 1995). Trial courts, however, have the authority to deny requested instructions and their decision to do so will only be reversed for an abuse of discretion. See Office Inc. v. Wilkey, 173 S.W.3d 226, 229 (Ky. 2005).

Though Dr. Nazar testified that he "supervised" the nursing staff and placed the Durahooks, Branham presented no other evidence tending to support his agency theory. Nurse Ball and Meshon Daniels, who both assisted Dr. Nazar on the day of Branham's surgery, made no mention of Dr. Nazar's orders during the operation, but instead both testified that they followed hospital protocol in their decision not to count the Durahooks. In his brief, Branham cites no other evidence that Dr. Nazar ordered or instructed the nursing staff on how to assist him during the operation. In the absence of more evidence establishing that Dr. Nazar had the right to control the details of the nurses' work, we cannot say that the trial court erred in refusing to instruct the jury on Branham's vicarious liability theory.

### C.    Branham's Settlement with Norton

Finally, Dr. Nazar argues that, even assuming that the nurses were his agents, he cannot be held liable for their negligence because Branham has

17

already settled with and released Norton's from liability. Because we have concluded that the trial court did not err in refusing to instruct the jury on Branham's vicarious liability theory, it is unnecessary for us to resolve this issue.

### D.  CONCLUSION

For the reasons mentioned above, we REVERSE the judgment of the Court of Appeals and reinstate the Judgment of the trial court in favor of Dr. Nazar.

Abramson, Cunningham, Noble, Scott, and Venters, JJ.; and Special Justice Jeffrey C. Mando and Special Justice Walter A. Baker, sitting. Abramson and Scott, JJ., and Special Justice Walter A. Baker, concur. Venters, J. concurs in part and dissents in part by separate opinion in which Cunningham and Noble, JJ., joins. Minton, C.J.; and Schroder, J., not sitting.

**VENTERS, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:** I concur with the sound reasoning and scholarly analysis expressed by Special Justice Mando in our rejection of the negligence *per se* rule of Laws v. Harter, 534 S.W.2d 449 (Ky. 1975), and adoption of the *res ipsa loquitor* approach to medical negligence issues arising from surgical objects left in a patient. But, I must respectfully dissent from the majority opinion with respect to the issue of Dr. Nazar's vicarious liability for the negligent failure of the

18

nursing staff to accurately count the Durahooks removed from his patient's scalp.

The Majority concedes that the dual agency doctrine of <u>City of Somerset v. Hart</u>, 549 S.W.2d 814 (Ky. 1977) is alive and well. But despite the substantial similarity in the facts of <u>Hart</u> and the instant case, the Majority concludes that Branham failed to produce sufficient evidence of an agency relationship between Dr. Nazar and the surgical nursing staff to justify submission of the issue to the jury. The existence of an agency relationship is a legal conclusion to be reached only after analyzing the relevant facts. <u>Wright v. Sullivan Payne Co.</u>, 839 S.W.2d 250, 253 (Ky. 1992). Where the facts are in dispute and the evidence is contradictory or conflicting, the question of agency is one of fact to be determined by the jury. <u>See</u> <u>CSX Transportation, Inc. v. First National Bank of Grayson</u>, 14 S.W.3d 563, 566 (Ky. App. 1999). The right to control is considered the most critical element in determining whether an agency relationship exists. <u>Id.</u> at 567. Nazar admitted that he was responsible for the removal of all of the Durahooks used. He testified that the surgical nursing staff was under his supervision during the surgery. He depended upon them to count the Durahooks as he removed them. The purpose for counting the Durahooks was to enable Dr. Nazar to ascertain that he had properly fulfilled his duty to remove all of them. It is inconceivable that, as the supervisor of the nurses during the surgery, Dr. Nazar did not have the right to control their counting of the "sharps". The Court, in <u>Hart</u>, stated:

> It is beyond cavil in this case that the accurate accounting for scalpel blades is "of mutual interest to both" the surgeon and the

19

hospital, that such an accounting "effects their common purpose", i.e., the cure of the patient, and that the surgeon issued no orders to operating staff in regard to the accounting for scalpel blades which conflicted with those of the Hospital. Consequently, the operating room staff acted as servants of both the surgeon and the hospital as a matter of law.

Id. at 817.

In its conclusion that the evidence was insufficient, even to warrant a jury instruction, the Majority observes that the nurses "made no mention of Dr. Nazar's orders during the operation" and that Branham cited no evidence that Dr. Nazar ordered or instructed the nursing staff on how to assist him during the operation. Those facts simply indicate that he may have been deficient in his supervision of the nurses, but they in no way negate his role as their supervisor and their role as his agents during the surgery. I would submit that Dr. Nazar's admissions resolve that issue in favor of Branham as a matter of law, but at a minimum, the matter should have been submitted to the jury.

Cunningham and Noble, JJ., join.

**COUNSEL FOR APPELLANTS/CROSS-APPELLEES:**

Gerald R. Toner
James Patrick Grohmann
Cathleen Charters Palmer
O'Bryan, Brown & Toner, PLLC.
1500 Stark Building
455 South Fourth Street
Louisville KY 40202


**COUNSEL FOR APPELLEE/CROSS-APPELLANT:**

Kevin Crosby Burke
Thomas Wesley Faulkner
125 South Seventh Street
Louisville KY 40202-2703


**COUNSEL FOR AMICUS CURIAE,**
**KENTUCKY SOCIETY OF INTERVENTIONAL PAIN PHYSICIANS:**

James Allen Sigler
300 Broadway
P O Box 995
Paducah KY 42002-0995

Jonathan D. Pitchford
James Richard Coltharp, Jr.
Whitlow, Roberts, Houston & Straub, PLLC.
300 Broadway
P O Box 995
Paducah KY 42002-0995


**COUNSEL FOR AMICUS CURIAE,**
**THE KENTUCKY CHAPTER OF AMERICAN COLLEGE**
**OF SURGEONS:**

Bradley R. Hume
Beth Hendrickson McMasters
Thompson Miller & Simpson, PLC.
600 West Main Street
Suite 500
Louisville KY 40202

# Supreme Court of Kentucky

2004-SC-001015-DG
AND
2005-SC-000834-DG


GREGORY B. NAZAR, M.D., AND
GREGORY B. NAZAR, M.D., P.S.C.　　　　APPELLANTS/CROSS-APPELLEES


ON REVIEW FROM COURT OF APPEALS
V.　　　　CASE NO. 2003-CA-001110-MR
JEFFERSON CIRCUIT COURT NO. 00-CI-006591


SHEILA BRANHAM, EXECUTRIX OF
THE ESTATE OF ROE BRANHAM　　　　APPELLEE/CROSS-APPELLANT


## ORDER DENYING PETITION FOR REHEARING
## AND GRANTING MODIFICATION


The Petition for Rehearing, filed by the Appellee/Cross-Appellant, of the Opinion of the Court rendered April 23, 2009, is DENIED.

The Opinion of the Court rendered on April 23, 2009, is MODIFIED by substitution of the attached Opinion in lieu of the original Opinion. Said modifications do not affect the holding of the Opinion or the Concurring in Part and Dissenting in Part Opinion as originally rendered.

Abramson, Cunningham, and Scott, JJ., concur. Special Justice Jeffrey C. Mando and Special Justice Walter A. Baker, concur. Noble and Venters,

JJ., dissent and would grant rehearing. Minton, C.J.; and Schroder, J., not sitting.

Entered: August 27, 2009.


_____
DEPUTY CHIEF JUSTICE