JONES, JUDGE:
This is a premises liability case. James Dexter ("Dexter"), the Appellant, filed a negligence claim against the Appellee, James Hanks ("Hanks"), in Marion Circuit Court seeking compensation for injuries he sustained when he fell off the roof of Hanks's home while applying sealer to it. The Marion Circuit Court granted summary judgment in favor of Hanks after concluding that there were no disputed issues of material fact, Hanks did not breach any duty of care owed to Dexter, and Dexter was an independent contractor. Following an unsuccessful CR [1] 59.05 motion, Dexter filed this appeal.[2] Having reviewed *791 the record in conjunction with all applicable legal authority, we affirm.
I. BACKGROUND
Hanks, a retired educator, owns a two-story, nineteenth century home located at 2435 Campbellsville Road, Lebanon, Kentucky. For several years prior to the incident in question, Hanks hired out various home improvement projects he needed help completing, especially those involving any kind of roof work because he was no longer able to climb a ladder. Hanks generally hired Tim McQueary ("McQueary") for his home maintenance projects. Eventually, however, McQueary became too busy to do odd jobs for Hanks. Sometime around 2012, McQueary told Hanks he should contact Dexter if he needed work done at his house and gave him Dexter's phone number. Dexter had previously assisted McQueary with various handyman projects in the area, including some work at Hanks's home. From that point forward, Hanks began hiring Dexter. Prior to the incident in question, Dexter had performed several different kinds of work for Hanks including cutting trees, mowing, raking, painting and caulking. One such project was in 2012, when Dexter painted the roof of Hanks's free-standing garage.
Sometime in 2013, Hanks contacted Dexter about a leak in an upstairs window. Dexter believed the leak might be coming from Hanks's roof. The roof of the house is like the roof of the garage Dexter had previously painted for Hanks; it is pitched with a standing-seam metal construction. The house roof, however, is divided into four sections; the parties refer to the section at issue in this case as the Campbellsville side because it faces Campbellsville Road. While trying to find the area of the roof causing the leak, Dexter went onto the house's roof at least two or three times before the incident in question.[3]
Dexter was not able to identify any distinct area of the roof that was allowing water to leak into the house. As a result, he recommended that Hanks paint the entire roof with sealer. Hanks agreed to the recommendation and asked Dexter to perform that work for him. They agreed that Hanks would pay Dexter ten dollars per hour with Hanks to purchase the sealer. The two men then traveled together to Lebanon Lumber and Hardware to purchase the sealer. Hanks purchased the sealer recommended by an employee of the hardware store. Dexter used a combination of his own tools and tools supplied by Hanks, including ladders, a broom, a paint roller, and a paint tray.[4]
Dexter began the work on July 13, 2013. Hanks testified that he and Dexter read the directions on the packaging of the sealer together.[5] Hanks retired to the inside of the home to watch television while *792 Dexter worked. Dexter used two of ladders get onto the roof. He carried all the tools and supplies he required onto the roof himself without any assistance from Hanks. Dexter testified in his deposition that once he was on the roof, he noticed some moisture on parts of it. Dexter then swept the area of the roof where he planned to begin applying the sealer. When he found it to be clean and dry enough to begin, he proceeded to paint the sealer on the roof. Dexter had to stand on the pitched portion of the Campbellsville side roof to apply sealer on the entire roof. After working for about ten minutes, Dexter turned to dip the paint roller in sealer. He had both hands on the roller. When Dexter went to turn back around, his feet slipped out from under him, and he fell onto his stomach and face. Dexter proceeded to slide down the roof. Unable to catch hold of anything, he fell twenty feet to the ground, landing on his feet.
Dexter found himself unable to walk after the fall so he called his wife and daughter to help him. Additionally, Dexter called Fred Minnie ("Minnie") to come get the supplies that were left on the roof. Minnie came to Hanks's home, climbed onto the roof, and retrieved the tools. Minnie left the supplies that belonged to Hanks at the home, and took the tools belonging to Dexter to Dexter's house and left them on the porch. Minnie could not recall the exact tools he returned to Dexter; he described them as a few "hand tools" such as hammers and the like.
In the meantime, Dexter's wife and daughter transported Dexter to Spring View Hospital for treatment. At the hospital, Dexter was diagnosed with a broken left foot and broken right ankle. He was admitted to the hospital where he underwent two surgeries. According to the record, Dexter incurred medical expenses of $ 70,953.67, missed thirty-seven weeks of work, and lost approximately $ 27,000 of income due to his injuries.[6]
On or about July 8, 2014, Dexter filed a civil negligence action against Hanks in Marion Circuit Court. In his complaint, Dexter alleged that Hanks was liable for his fall and resulting injuries "due to a dangerous condition on [Hanks's] property of which [Hanks] created, knew, or should have known." Dexter characterized himself as an "invitee" to Hanks's property, and that Hanks had a duty to discover, warn and/or protect Dexter from the dangerous condition of his property. In his answer, Hanks asserted that Dexter was an independent contractor and that he did not breach any duty to him. For the next few years, the parties engaged in discovery, which included the depositions of Dexter, Hanks, Minnie, McQueary, and Dexter's treating physician, Dr. Daniel Hunt.
Although not entirely clear from the pleadings alone, it appears that Dexter's initial theory was that Hanks created a dangerous condition because he sprayed the roof with water right before Dexter began his work. Dexter explained that the roof was wet when he started his work and he saw Hanks hooking up the garden hose while he was carrying his supplies up the ladders. Dexter explained he believed that Hanks was intending to spray the roof because the instructions on the sealer said the surface had to be cleaned before application. Dexter, however, admitted he never saw Hanks spray the roof and did not know for certain that he did so. Dexter also admitted that there was not a great deal of water on the roof and that it could have just been moisture from the morning dew. In any event, it is clear he knew the *793 roof was wet before he started his work on it.
For the most part, Hanks did not remember a great deal about the incident by the time his deposition was taken.[7] Hanks testified that he had been using Dexter to do odd jobs for some time, although he was not exactly sure how long. When Hanks needed a job done at one of his properties, either he, his wife, or his son would call Dexter. Hanks always paid Dexter ten dollars per hour in cash for his work. Hanks testified that he did not have "a plan" regarding how Dexter was going to paint the roof and relied on Dexter "to know what to do." Hanks denied that he sprayed the roof on the day in question. He further testified that he never intended to go up on the roof to supervise Dexter. He explained that he was unable to climb a ladder, had not been on the roof for twenty years, and had no idea of the roof's condition.
Following the completion of discovery, Hanks filed a motion for summary judgment. Therein, Hanks argued that Dexter was an independent contractor who was responsible for ensuring his own safety while working on Hanks's roof. Alternatively, he argued that Dexter could not put forth any evidence to show that Hanks was aware of a dangerous condition on the roof that he had a duty to warn Dexter about before his fall.
Ultimately, the trial court granted Hanks's motion. It reasoned that Dexter had failed to identify any proof that Hanks sprayed the roof with water. The trial court noted, however, that even if Hanks had sprayed the roof, Dexter testified that he swept the area with a broom. The court reasoned that the water was not the dangerous condition that caused Dexter to fall. Next, the trial court examined Dexter's theory that Hanks failed to warn or protect Dexter about the dangerous nature of his roof. The court noted that Dexter was aware of the roof's design and steepness as he had been on it before and that any reasonable person would be aware that roofs are inherently dangerous. Finally, the trial court determined that Dexter was not working as Hanks's employee, and therefore, Hanks had no duty to supply Dexter with a safety harness or other protective equipment.
This appeal followed.
II. STANDARD OF REVIEW
Summary judgment is appropriate when there are "no genuine issues as to any material fact and that the moving party is entitled to judgement as a matter of law." CR [8] 56.03. The record must be viewed in a light most favorable to the party opposing the motion for summary judgment. Steelvest, Inc. v. Scansteel Serv. Ctr., Inc. , 807 S.W.2d 476, 480 (Ky. 1991) (citations omitted). Summary judgment is not to be used as a substitute for trial and thus should be cautiously applied. Id. Consequently, it is only appropriate when, as a matter of law, "it would be impossible for the respondent to produce evidence at the trial warranting a judgment in his favor against the movant." Id.
Summary judgment is a question of law; therefore, this Court reviews a trial court grant of summary judgment de novo. City of Florence v. Chipman, 38 S.W.3d 387, 390 (Ky. 2001). We are not required to afford any deference to the trial court's *794 decision. Shelton v. Kentucky Easter Seals Soc., Inc. , 413 S.W.3d 901, 905 (Ky. 2013).
III. ANALYSIS
The parties devote a significant portion of their briefs to the Shelton decision. In Shelton , the Kentucky Supreme Court held that "a possessor of land owes a duty to an invitee to discover unreasonably dangerous conditions on the land and either eliminate or warn of them." Id. at 909 (emphasis added). Dexter argues he was a business invitee, and therefore, Shelton defines the duty Hanks owed him. Following briefing in this appeal, however, the Kentucky Supreme Court rendered its decision in Auslander Properties, LLC v. Nalley , 558 S.W.3d 457 (Ky. 2018). Auslander is factually analogous and resolves many of the issues briefed by the parties in this case, including the nature of the duty owed to Dexter.
Joseph Herman Nalley ("Nalley"), was injured while working on the roof of a rental property owned by Auslander Properties, LLC ("the LLC"). Like Dexter, Nalley performed handyman-type work for the LLC from time to time. When one of the LLC's tenants complained that tree limbs overhanging its building were causing a problem, the LLC hired Nalley to remove the offending branches from the trees. After viewing the job to be done, Nalley decided that the best way to gain access to the branches was by way of the building's roof. Nalley climbed to the roof with his saw. One of the LLC's members, Steve Auslander ("Auslander"), a retired dentist, remained on the ground to assist Nalley. Once on the roof, Nalley tied a rope to the limb he intended to cut and dropped the end of the rope to the ground. As Nalley sawed the limb, Auslander pulled the rope to guide the limb's fall. No problem was encountered with the first tree limb. However, while working on the second limb, Nalley stepped from the roof's solid shingled surface onto a section of decorative wooden rafters that was not designed to support his weight. He fell eleven feet onto a concrete surface and sustained severely disabling injuries, including fractures to his spine and a traumatic brain injury.
Nalley filed suit alleging the LLC was negligent in breaching the common law duties owed by a landowner to invitees on the property. He also alleged that the LLC was negligent per se because it failed to comply with KOSHA regulations requiring employers to provide safety equipment for employees working at heights above 10 feet. The case was submitted to the jury on both theories of liability.
With respect to the common law negligence claim, the jury answered special interrogatory instructions determining that: 1) the cosmetic nature of the exposed decorative rafters was either obvious to, or was known by, Nalley; and 2) in the exercise of ordinary care, the LLC should not have anticipated that Nalley might rely upon the load-bearing capability of the decorative rafters and fall as a result thereof. The jury also determined by special interrogatory instructions the largely uncontested material facts pertaining to Nalley's KOSHA claim. Specifically, the jury found that Nalley was working at a height of more than 10 feet when he fell; that the LLC had not provided safety equipment that would have prevented his fall; and that the lack of such equipment was a substantial factor in causing Nalley's injuries. Consistent with those findings, the trial court entered judgment for Nalley.
*795 In holding that the LLC was not liable on Nalley's negligence per se theory for violating KOSHA, the Kentucky Supreme Court held that the LLC was not responsible for providing safety equipment to Nalley because he was an independent contractor who should have been aware of the risks associated with climbing onto a roof and provided his own safety equipment. The Court explained:
At the time of his injury, Nalley was an independent contractor rather than an employee of the LLC, and he was performing specialized work unrelated to the normal operations of the LLC's property rental business. The responsibility for complying with safety laws applicable to that specialized work was upon Nalley. Since the LLC had no duty of compliance, Nalley's negligence per se claim fails as a matter of law.
Id. at 467.
The Court then turned to Nalley's argument that the trial court should have sustained his motion for a directed verdict on his common law negligence count. In evaluating this argument, Court noted that premises liability claims are treated differently when the plaintiff is an independent contractor as opposed to an ordinary business invitee.
In the context of a premises liability claim, a landowner is not liable to an independent contractor for injuries sustained from defects or dangers that the independent contractor knows or ought to know of. Owens v. Clary , 256 Ky. 44, 75 S.W.2d 536, 537 (Ky. 1934). Only when "the defect or danger is hidden and known to the owner, and neither known to the contractor, nor such as he ought to know," is the landowner liable for the contractor's injuries absent a warning. Id. at 537.
Id.
The standard used for independent contractors, as explained by the Court in Auslander , obviously differs from the more lenient standard espoused by the Court for ordinary business invitees. A landowner owes ordinary business invitees a duty "to discover unreasonably dangerous conditions on the land and either eliminate or warn of them." Shelton , 413 S.W.3d at 909 (emphasis added).[9] In contrast, as explained in Auslander , when the individual is an independent contractor as opposed to an invitee, the landowner only has a duty to warn of (1) hidden or latent defects; (2) the landowner actually knows about; and (3) the contractor does not or cannot discover himself. Auslander , 558 S.W.3d at 467.
Our first task then is to determine whether the trial court correctly concluded that Dexter was an independent contractor. "An individual is the agent of another if the principal has the *796 power or responsibility to control the method, manner, and details of the agent's work." Nazar v. Branham , 291 S.W.3d 599, 606-07 (Ky. 2009). "If, however, an individual is free to determine how work is done and the principal cares only about the end result, then that individual is an independent contractor." Id.[10] When the facts are substantially undisputed, as they are in this case, whether a worker is an independent contractor is a question of law. Uninsured Employers' Fund v. Garland , 805 S.W.2d 116, 117 (Ky. 1991).
Hanks originally contacted Dexter about a leak. When Dexter was unable to figure out the exact location on the roof that needed to be fixed to stop the leak, he recommended that Hanks have the whole roof sealed. Hanks asked Dexter to do the work, and Dexter agreed. Dexter admitted during his deposition that Hanks was not overseeing or directing his work in any way. Dexter was free to determine how best to get the roof sealed. Hanks was concerned only with the end result, a sealed roof that did not leak. While Hanks may have supplied some of the tools, it is clear to us that was more out of convenience than a desire to control how the work was performed. Based on the undisputed facts, we agree with the trial court that Dexter was an independent contractor.
Because Dexter was an independent contractor, Hanks did not have a duty to supply with him any safety equipment such as a harness. Auslander , 558 S.W.3d at 467. Of course, this does not mean that Hanks did not owe Dexter any duty. In determining the duty owed to Dexter, "[w]e look at what the premises owner [Hanks] actually knew at the time the independent contractor [Dexter] worked on the premises." Brewster , 279 S.W.3d at 148 ; see also McCarty v. Covol Fuels No. 2, LLC , 978 F. Supp. 2d 799, 807 (W.D. Ky. 2013) ("Kentucky requires actual, rather than constructive, knowledge of a latent defect by a premises owner in order to establish a duty to warn or take steps to protect an independent contractor and its employees."). Even then, we are only concerned only with dangers that Dexter had no actual or constructive knowledge existed on the roof.
Dexter had been on the roof several times before. He knew its slope, material, and layout. On the day in question, regardless of how the water got on the roof, Dexter knew portions of the roof were wet when he started his work. While Dexter may not have previously applied sealant to the roof, he was certainly either actually or constructively aware sealant would make the roof slick. In short, Dexter failed to identify a single risk that Hanks knew that was unknown to Dexter. In fact, the evidence showed that Hanks had not personally been on the roof in at least twenty years and did not know of anything about it other than the obvious things Dexter was able to see for himself.
*797 The trial court properly granted summary judgment to Hanks. Dexter was an independent contractor. He failed to produce any evidence that Hanks was actually aware of a dangerous condition on the roof that Dexter himself did not or could not have known existed. As such, Dexter could not establish as a matter of law that Hanks breached any duty, making it impossible for him to prevail at trial.
IV. CONCLUSION
For the foregoing reasons we affirm the Marion Circuit Court's grant of summary judgment in favor of James Hanks.
ALL CONCUR.

Kentucky Rules of Civil Procedure.

Dexter's notice of appeal designated two orders for appeal: (1) the trial court's December 28, 2017, order granting summary judgment to Hanks; and (2) the trial court's February 1, 2018, order denying Dexter's CR 59.05 motion to alter, vacate, or amend. Only the first order is subject to appellate review. "Orders denying CR 59.05 relief 'are interlocutory, i.e. , non-final and non-appealable and cannot be made so by including the finality recitations.' " Hoffman v. Hoffman , 500 S.W.3d 234, 236 (Ky. App. 2016) (quoting Tax Ease Lien Invests. 1, LLC v. Brown , 340 S.W.3d 99, 103 (Ky. App. 2011) ); see also Mingey v. Cline Leasing Serv., Inc. , 707 S.W.2d 794, 796 (Ky. App. 1986) ("Unlike a ruling denying a motion for relief under CR 60.02, a ruling on a CR 59.05 motion is not a final or an appealable order. There is no authority in the rules to ask for reconsideration of a mere order which rules on a motion to reconsider a judgment.") (internal citation omitted).

The Campbellsville side of the roof was not near the leak, so Hanks did not go onto that side of the roof.

Hanks asserts in his brief that he did not use any of his own tools. The depositions filed of record, however, indicate that Hanks took several of his own hand tools up on the roof with him. It is unclear how he planned to use those tools, but the fact that the carried them up onto the roof suggests he thought he might need them at some point.

Hanks did not recall reading the instructions with Dexter. For the purposes of evaluating the propriety of summary judgment, however, we accept the facts as testified to by Dexter.

According to the record, Dexter was working at a local factory immediately prior to his injuries. He had worked there for about ten months.

The record indicates Hanks suffered a fall at Keeneland sometime in 2014 that took a physical and emotional toll on him and possibly contributed to his inability to recall some of the background details.

Kentucky Rules of Civil Procedure.

Prior to Auslander , the Kentucky Supreme Court rejected the adoption of a more lenient standard for independent contractors:
While other jurisdictions may use a test where the premises owner's duty to warn depends on its having knowledge of a risk superior to that of its contractor, we believe this comparative approach would yield more confusion and factual disputes. We find our traditional approach, which demands that the premises owner have actual knowledge of the danger and the contractor have neither actual nor constructive knowledge of the danger for the premises owner's duty to warn to arise, is still the most straightforward and fair approach. So, we find no reason to abandon our traditional approach in favor of a superior knowledge approach.
Brewster v. Colgate-Palmolive Co. , 279 S.W.3d 142, 149 (Ky. 2009) (emphasis added).

This test is different than the broader and more lenient multi-factor test used to determine whether an individual is an employee or independent contractor under the Workers' Compensation Act. See Ratliff v. Redmon , 396 S.W.2d 320, 323 (Ky. 1965). Even so, most of those factors weigh toward Dexter being an independent contractor. Dexter did not work set hours. Dexter's work required skill to perform certain tasks. Hanks did not train or otherwise dictate the specifics of Dexter's work. Dexter was paid in cash for completing specific projects.