Christopher TUCKER, as Administrator of the Estate of Mindi Tucker, Deceased; Christopher Tucker, Kentucky Guardianship Administrator; Donald McNay, as Conservator for Megan Tucker, Minor Child; Donald McNay, as Conservator for Jordan Tucker, Minor Child; and Donald McNay, as Conservator for Shane Tucker, Minor Child, Appellants,

v.

WOMEN'S CARE PHYSICIANS OF LOUISVILLE, P.S.C.; and Susan Bunch, M.D., Appellees.

No. 2010–SC–000466–DG.

Supreme Court of Kentucky.

Oct. 25, 2012.

Richard Wayne Hay, Sarah Hay Knight, Somerset, KY, Timothy R. McCarthy, Nutt Law Office, Louisville, KY, Wanda McClure Dry, Oak Ridge, TN, Counsel for Appellants.

Donald W. Darby, Daniel Garland Brown, Darby & Gazak, P.S.C., Louisville, KY, Counsel for Appellees.

Opinion of the Court by Justice NOBLE.

This is a medical malpractice action brought by the administrator of the Estate of Mindi Tucker, who died of complications from a Streptococcus–A infection that developed after caesarian delivery of her child at Baptist Hospital East in Louisville, Kentucky. Her obstetrician was Susan Bunch, M.D., a member of Women's Care Physicians of Louisville, P.S.C. Dr. Bunch and Women's Care are the only remaining defendants in this case. The claim of medical negligence centered on the failure to administer the antibiotic Cefotan during the delivery process, which the Estate alleged would have prevented the infection. The issues on appeal are whether the trial court erred in not allowing expert testimony on the meaning of the doctor's standing order regarding the antibiotic, and whether the Estate should have been allowed to impeach the doctor's expert witness with the deposition of another physician. For

the reasons stated below, the Court of Appeals is affirmed.

## I. Background

Mindi Tucker, the decedent, was extremely frightened the night she went to Baptist Hospital East for the delivery of her third child. Her fear rose to the point that the attending nurse, Janet Wilcox, described her as the most frightened and distressed patient she had ever seen. This level of stress required Nurse Wilcox to deal closely with the patient before and during the caesarian delivery, to the point that the nurse failed to obtain the antibiotic Cefotan for administration at the clamping of the cord, which she was required to do based on Dr. Bunch's standard delivery order. Mindi Tucker had a rash when she was admitted to the hospital, and the Estate argued that the failure to give the Cefotan resulted in the development of an aggressive infection from which Mindi died a few days after the delivery.

Dr. Bunch was a member of a practice group, Women's Care Physicians of Louisville, P.S.C., which had filed a standard delivery order with Baptist Hospital East. That order is a point of contention in this case. The order states: "For all C-sections: Have 2 grams of Cefotan prepared for infusion at the time of cord clamping." Both Dr. Bunch and Nurse Wilcox testified that the procedure in the delivery room at Baptist Hospital East was for the anesthesiologist to administer all drugs through the IV apparatus.

Nurse Wilcox was very distracted in calming Mindi Tucker, who was awake during the entire procedure, and consequently did not get the Cefotan from a nearby refrigerator where it was stored, nor did she give it to the anesthesiologist at the time of cord clamping so that it could be administered to the patient through the IV apparatus. Dr. Bunch did

not give a verbal order for the Cefotan to be administered. The anesthesiologist did not draw any attention to the omission. The baby was successfully delivered by caesarian section, and Mindi was taken to a hospital room.

She very quickly began to show signs of a rapidly developing infection, which turned out to be Streptococcus A. All efforts to cure the infection failed, and Mindi died. In the Mortality Report, Dr. Bunch wrote: "Because of her Penicillin allergy and our routine drug for antibiotic prophylaxis for caesarian section at cord clamping is Cefotan, opted not to give her perioperative prophylactic antibiotic because of the Penicillin allergy." Dr. Bunch later testified that she had assumed that the nurse or the anesthesiologist had read Mindi Tucker's chart, seen the allergy, and opted not to give the drug because of an allergic reaction that could come from the Cefotan.

Much of the discovery in the case was focused on what the standing order meant: whether Nurse Wilcox was supposed to administer the antibiotic at cord clamping or merely to have it ready. The Estate developed its proof that the standing order (Order 11) was ambiguous, and that the doctor had therefore failed to order the giving of the antibiotic, which resulted in Mindi's untreated infection. However, both Nurse Wilcox and Dr. Bunch testified in deposition and at trial that they understood the order to mean that the nurse would prepare the Cefotan for administering by getting the pre-mixed drug from the refrigerator, charging it to the patient, and giving it to the anesthesiologist, who would then administer it through the IV apparatus.

At the trial in this case, the Estate asked to introduce expert testimony that the standing order was ambiguous, and thus it was the doctor's failure to give the proper order that led to the patient's death. The trial court did not allow admission of this testimony on the grounds that it was not relevant, namely that the evidence established that the nurse and the doctor perceived no ambiguity in the order, and that it was *their* perception that was relevant.

The Estate also wanted to cross-examine one of Dr. Bunch's expert witnesses with the deposition testimony of an expert retained by the Estate, Dr. Charles Stratton. Dr. Stratton had testified in his deposition generally about how he used antibiotic prophylactics during surgery, and that a different antibiotic that he used, Kefzol, generally would be effective to prevent postoperative infections. He also testified that Kefzol covered a different range of organisms than Cefotan, though he did not state whether either drug would have prevented the Streptococcus A infection. The trial court did not allow the deposition to be used because it had not been presented in the Estate's case-in-chief, even after the Estate belatedly argued that it wished to use the deposition for impeachment purposes.

The Court of Appeals held that the trial court did not abuse its discretion in disallowing the expert testimony or the deposition of Dr. Stratton, and affirmed. This Court granted discretionary review to determine if a trial court properly exercises discretion when ruling that expert testimony about the meaning of a physician's standing order is inadmissible when the meaning of the order is not factually in question.

## II. Analysis

Expert testimony in a civil action has one purpose only: to assist the trier-of-fact in understanding the evidence or determining what the facts are. KRE 702. Expert testimony that does not go directly to explaining or clarifying a complicated

matter so that a juror can more easily understand it is irrelevant and tends to confuse jurors about the issues. Such testimony is thus inadmissible. *See Goodyear Tire and Rubber Co. v. Thompson,* 11 S.W.3d 575, 578 (Ky.2000) ("[P]roffered expert testimony ... must be both relevant and reliable.").

In all cases, the facts are the basis for what law applies, the relevancy of evidence, and how a trial court decides what evidence is admissible. In this case, the Estate sought to engage in an irrelevant inquiry about whether the doctor's standing order was actually a "give" order or a "prepare" order. To this end, the Estate asked to admit the opinions of experts to show that the order was merely a "prepare" order. But such proof is relevant only if the person to whom the order is directed, the circulating nurse, misunderstood it or thought it was ambiguous. To the only person who needed to know, Nurse Wilcox, there was no misunderstanding or ambiguity, and the proof plainly showed that.

Moreover, under the Estate's theory of the case, Dr. Bunch's order should have been a "give" order, rather than a "prepare" order. But whether it was a give or prepare order was also irrelevant since it was never the circulating nurse's duty to "give" the drugs, that is, to administer to the patient. The proof plainly showed this also.

There is no dispute that antibiotics were not given to the decedent, a woman with a suspicious skin rash during the caesarian delivery of her child. She almost immediately developed a severe infection from which she later died. Her estate argued that had she been given the antibiotics, she would not have died. Sadly, it was the attending obstetrics doctor's *routine* practice to give these antibiotics when the fetal cord was clamped on delivery. To that end, her treatment group kept a set of standing orders on file at Baptist Hospital East in Louisville. The order is arguably ambiguous in that it merely stated: "For all C-sections: Have two grams Cefotan prepared for infusion at the time of cord clamping."

But, according to the testimony of Dr. Susan Bunch, the attending obstetrician, and, Janet Wilcox, the circulating nurse, the operating room procedure at Baptist East Hospital required the nurse to "prepare" all medications to be used during the surgery. Under those procedures, any medications are "given" by the *anesthesiologist,* a physician, who injects them through an intravenous system.

Nurse Wilcox testified *both* in her deposition and at trial that she never actually gave medication to patients because it was administered by the anesthesiologist through their IVs. She knew, however, that she was to "prepare" the antibiotic, that is, have the antibiotic ready for administration. She testified that she would ordinarily go to the refrigerator, enter the patient's code to log out the medicine, sign the medicine out to the patient's number, and then bring the medicine to the operating table and deliver it to the anesthesiologist for administration at the time of cord clamping. She also testified that on the day of the decedent's caesarean she was so occupied with calming the overwrought woman that she was distracted and did not prepare the medicine to give to the anesthesiologist at the proper time.

At some point in the discovery in this case, the attorneys became focused on what the standing order required Nurse Wilcox to do, and the dialogue centered on whether the order was a "give" or a "prepare" order. Much pre-trial discovery and trial testimony were aimed at this question, and now on appeal it is argued that the trial court impermissibly restricted the

Estate's expert evidence about what the order meant. It appears, however, that the only people confused about what the order meant are the experts.

Dr. Bunch testified that no further verbal order was required in addition to the standing order to get the antibiotics delivered to the anesthesiologist to administer, and that she had done her duty by ordering that it be ready for infusion. Nurse Wilcox's responsibility was to give the medicine *to the anesthesiologist* at the appropriate time, not to "give" it to the patient. The nurse consistently stated that this was her duty, that she knew it from prior review of the standing order, and that on the day in question she did not do it because she got distracted with soothing the overwrought patient.

This evidence was presented through her deposition, her live testimony, and the doctor's testimony. The jury and the trial court heard this testimony. The jury also heard cross-examination of these two witnesses about what kind of order the standing order was. Both witnesses tried to answer the questions, but it is clear that the alleged ambiguity of the language in the order had more significance for the lawyers than it did for the doctor and the nurse.

It is immaterial under the facts of this case how someone else, even a medical expert, might view the meaning of the language in the standing order. Nurse Wilcox has never been inconsistent about acknowledging that she knew that she needed to get the medicine and give it to the anesthesiologist at cord clamping, and that she did not do so. It is obvious that if she had done what she knew she was supposed to do, the antibiotics would have

been given. Indeed, in her deposition, Nurse Wilcox stated that part of her duties included speaking up and asking the doctors whether the antibiotic should be given, which she failed to do because the patient was so nervous—"the most nervous of any lady [she'd] ever seen"—and scared, and, by inference, distracting.[1]

The testimonial waters only got muddied when the nurse tried to explain to the attorneys that she was not supposed to give the antibiotics to the patient. This is because she did not have that duty: the anesthesiologist did.

The Estate wanted to offer the testimony of a nurse and two doctors at trial as expert opinion about what the order as written required the nurse to do, as either a "give" order or a "prepare" order. Before that testimony could even begin to be relevant, the Estate would have to demonstrate that Nurse Wilcox perceived the order to be ambiguous or that she misunderstood what the order said. But the nurse knew what it meant; she simply did not follow the order. Thus, the experts' interpretation of the order is simply irrelevant.

During the deposition, the attorneys asked Nurse Wilcox whether she "mixed" the antibiotics or whether the pharmacy did so, to which she responded that they came ready to give from the manufacturer. This line of questioning was presumably aimed at showing that "preparing" the drug meant something like mixing a powder with a liquid or "compounding" the drug as some pharmacists do. But this too simply muddied the waters further and was little more than a red herring. In describing the process for administering

1. When asked later in the deposition whether she was responsible for making sure the antibiotics are administered, Nurse Wilcox stated, "It's not my duty to make sure they are given. It's my duty to make sure, as this order says, that it's there on the unit ready to give. I don't actually give it."

the antibiotics during the procedure, the doctor and the nurse testified that the nurse's duty was to prepare the antibiotic for delivery both by getting it from the refrigerator *and* by then giving it to the anesthesiologist to administer. Even if one assumes that the language in the order makes it a "prepare" order, as the Estate argues, it is clear that the nurse did not do that.

The Estate argued that the doctor had some further duty to question the nurse and anesthesiologist as to whether the antibiotic had actually been given. But the attending doctor does not administer the antibiotic, as all the hospital's personnel knew; the anesthesiologist does. She had already told the nurse through her standing order to have it ready "for infusion at the time of cord clamping." This Court has previously recognized that the operating doctor is not "the captain of the ship" to the extent that he or she is responsible for the duties of other operating room personnel. *See Nazar v. Branham*, 291 S.W.3d 599, 607–08 (Ky.2009) (holding that, absent facts that showed that an agency relationship existed, a surgeon may not be presumed to be a principal and therefore was not vicariously liable for the negligent acts of the nurses in the operating room).

While it may be true that the doctor could have written an order that is clearer and more succinct—arguably she did based on a similar order from another hospital where she attended—the bottom line in this case is that the order was abundantly clear to the nurse charged with the order, based on her trial and deposition testimony. If she had done what she says that she knew she was supposed to do, the antibiotics would have been given.

In short, there was no ambiguity in the order, at least not to the only person who had to know what it meant: Nurse Wilcox.

Thus the opinion of "experts" about the meaning of the order does nothing but create further obfuscation and useless legal maneuvering. It is not relevant, as the Court of Appeals clearly pointed out in its opinion. The trial court, which heard all the evidence, simply tried to keep this case on track despite the arguments of counsel. The court made a sound decision not to allow useless expert opinion which could only serve to focus the jury's attention on a collateral non-issue. This function is exactly what a trial court is supposed to do. The order was not ambiguous to Nurse Wilcox, and thus what it "meant" to an expert reviewing the case makes no difference in whether she did or did not carry out the order, even if someone else reading it was confused. Nurse Wilcox was not confused; she was distracted.

■ The argument has been made that the death summary prepared by Dr. Bunch included the phrase "opted not to give" regarding the antibiotics, and that this indicates that *she* either chose not to give the antibiotics during the procedure or that she was trying to cover up her failure after the patient's death. But she just as likely could have been stating that *someone* opted not to give the antibiotics, as she testified at trial, because it was a known fact by that time that they had not been given. In trying to answer why the antibiotics had not been given, Dr. Bunch testified that she thought maybe the nurse had not given the antibiotics to the anesthesiologist because the patient was allergic to them. In any event, the jury was in the best position to view this statement in context with all the evidence, and apparently did not give it much weight. This Court cannot substitute its view of the evidence for that of the jury unless it is clearly erroneous. Given the alternative ways to view the statement, the jury was not clearly erroneous.

The doctor was also asked what other medicine could have been used instead of the Cefotan, a question instigated by the deposition of Dr. Allen, an Estate witness, which also concerned a collateral, irrelevant line of testimony, discussed further below. Clearly, it matters not what medicine could have been used if the nurse was too distracted to give it to the anesthesiologist.

The trial court properly exercised its discretion not to allow the expert testimony.

The Estate further argues that the trial court erred in not allowing impeachment of Dr. Stratton by the use of Dr. Allen's deposition. But if Dr. Allen's deposition is carefully reviewed, it is clear that it does not impeach Dr. Stratton. Dr. Allen stated that he does not use Cefotan, admitted that it covers a different range of organisms than his favored antibiotic does, and offered no opinion that either antibiotic would have been sufficient to save the patient. The fact that Dr. Allen routinely uses an antibiotic during caesarian deliveries also does not impeach nor does it offer contrary expert proof. Dr. Bunch also routinely required antibiotics during a caesarian, as her standing order indicated. The trial court did not abuse its discretion when it denied admission of this evidence.

Consequently, the Court of Appeals' well-written opinion is affirmed.

MINTON, C.J.; ABRAMSON and CUNNINGHAM, JJ., concur. VENTERS, J., dissents by separate opinion in which SCHRODER and SCOTT, JJ., join.

VENTERS, J., dissents by separate opinion:

I respectfully dissent. The Majority misconstrues Nurse Wilcox's pretrial deposition testimony and that misconstruction leads to its erroneous conclusion that the trial court properly excluded the proffered testimony of Nurse Mileski, Dr. Richard Sweet, and Dr. Steven Savage about the meaning of Dr. Bunch's written order to Nurse Wilcox to "*have [the antibiotic] prepared for infusion at the time of cord clamping.*" It is important to recognize the precise issue in dispute to ascertain the relevance of the proffered testimony.

There is no dispute that the failure to administer to Mrs. Tucker a prophylactic antibiotic during her c-section was medical malpractice by someone. There is no dispute that Dr. Bunch alone had the professional duty to order the administration of the antibiotic. There is no dispute that Dr. Bunch's only claim to compliance with that duty was the written order noted above, which was referred to in the record as "Order 11." There is no dispute that the antibiotic was not given, and that Mrs. Tucker died. The issue was who, among the medical professionals present during the surgery was supposed to initiate the giving of the antibiotic. Not I said Dr. Bunch; not I said Dr. Savage, the attending anesthesiologist.[2] Not I said Nurse Wilcox, at least in her pretrial deposition.

What Order 11 meant to Nurse Wilcox was extremely relevant. Wilcox was an experience obstetrical nurse but she had never before worked a c-section procedure with Dr. Bunch. Mrs. Tucker's c-section was the first time Wilcox stood in as the charge nurse for Dr. Bunch. Some doctors, Wilcox explained, gave standing orders directing the nurse to initiate the process of administering the antibiotic, but other doctors preferred that the nurse merely have it available and ready to administer when the drug was called for. In her deposition testimony, Wilcox insisted that Dr. Bunch's Order 11 was of the latter

---

**2.** There was no allegation in this case that Dr. Savage violated any standard of care.

type. She vigorously denied that Dr. Bunch's order required her to do anything other than to have the antibiotic "prepared for infusion." Wilcox steadfastly asserted that the antibiotic was ready. "It's not my duty," she proclaimed, "to make sure [the antibiotics] are given. It's my duty to make sure, *as the order says,* that [the antibiotic] is there on the unit *ready to give.* I don't actually give it."

But, at trial, Wilcox reversed course and testified that Dr. Bunch's order did indeed mean that Wilcox was expected to initiate the giving of the antibiotic, not merely to have it "prepared for infusion." So, which was correct? Had Wilcox been ordered to administer that antibiotic at cord clamping without further discussion? Of course, as the Majority notes, it is always the anesthesiologist that physically infuses the drug by putting it into the patient's IV port. But the issue here is who was supposed to initiate that process? Who actually was supposed to say, in words or gestures, "Here is the Cefotan, Doctor;" or "Hand me the Cefotan, Nurse?" Before trial, everyone including Wilcox disclaimed that responsibility and said it belonged to someone else.

If the pretrial deposition testimony was truthful, then Order 11 did not satisfy Dr. Bunch's duty to order the giving of the antibiotic. Wilcox's pretrial testimony is certainly consistent with the curious notation that Dr. Bunch made on the medical record within hours of Mrs. Tucker's death. Dr. Bunch wrote: "Because of her Penicillin allergy and our routine drug for antibiotic prophylaxis [for c-section patients] is Cefotan, *opted not to give her* perioperative prophylactic antibiotic[.]" Despite her denial, that notation was strong evidence that Dr. Bunch had "opted" not to use the antibiotic and it supported Wilcox's pretrial statement that Dr. Bunch's order did *not* direct Wilcox to give

the antibiotic. As additional supporting evidence, Appellant's proffered the testimony of the three medical experts to address the question of the meaning of Order 11.

Because Nurse Wilcox gave two different versions of what the order meant to her, it became relevant to establish that an obstetrical nurse who, like Wilcox, was not familiar with Dr Bunch's practice and expectations, would regard Order 11 as a "prepare only" order, directing her only to have the antibiotic ready and available for when it was called for. Such testimony was relevant because of its propensity to show that Wilcox's honest understanding of the order was as she claimed in her deposition, not as she stated it during the trial. It tended to confirm the accuracy of Wilcox's original claim that she had not been told to initiate the giving of the drug.

If, as Dr. Bunch claimed, and Wilcox claimed in her trial testimony, Order 11 was an unequivocal command of Dr. Bunch for Wilcox to initiate the process of giving the antibiotic, *why in the world* would Dr. Bunch note in the post-mortem record that she (or someone) had "opted" *not* to order the antibiotic? Each of Appellant's proffered experts had testimony that was relevant and highly probative on that critical point. The three experts proffered by Appellant tended to prove the reasonableness of Wilcox's pretrial interpretation of Order 11, and thereby each witness gave credence to the Appellant's position that Order 11 did *not* order Wilcox to initiate the giving of the antibiotic. The trial court's failure to admit that evidence was error, and this Court should reverse it. Accordingly, I dissent.

SCHRODER and SCOTT, JJ., join.